STATE of Maine

v.

Roy DANA, Jr.

Supreme Judicial Court of Maine.

Sept. 19, 1979.

David M. Cox, Dist. Atty., Gary F. Thorne (orally), Deputy Dist. Atty., Bangor, for plaintiff.

Kollman & Tarbell, Swift Tarbell, III, William C. Kollman, II (orally), Bangor, for defendant.

Before McKUSICK, C. J., POMEROY, WERNICK, ARCHIBALD, GODFREY and NICHOLS, JJ., and DELAHANTY, A. R. J.

ARCHIBALD, Justice.

The defendant has appealed four convictions[1] following guilty verdicts in a jury trial in which all charges had been joined.

We deny each appeal.

The defendant did not dispute the fact that he had done the physical acts attributed to him in the various indictments. The inability to formulate the necessary criminal intent to convert any of those acts into statutory violations because of an advanced state of intoxication was the primary theory of the defense. The appeal is not premised on insufficiency of the evidence, however, but on what the defendant claims to have been the prejudicial nature of two segments of the prosecutor's argument to the jury.

I

■ James R. Young, an analytical chemist, testified for the State. Based upon the defendant's weight, the amount of beer and wine the defendant claimed to have consumed, the alcoholic content thereof, and the time period over which it was consumed and metabolized, the chemist theorized the appellant's blood-alcohol level could have been ".86" at the time of the arrest. The only testimony that related this percentage to the defendant's probable condition was contained in the following exchange:

[PROSECUTOR]: [I]n your studies of persons who have been operating under the influence, what is the highest particular reading that you've ever gotten in your analysis?

[DR. YOUNG]: I have had a post-mortem sample that was a .49.

[PROSECUTOR]: Post-mortem?

[DR. YOUNG]: Yes.

The appellant twice successfully objected to subsequent attempts to elicit testimony relative to his blood-alcohol level. When the prosecutor sought to ask the chemist what the appellant's physical condition would have been if he had attained a blood-alcohol level of ".86," appellant's objection was again sustained.

Prior to final argument by the attorneys, counsel for the appellant sought to limit the State's argument relative to the post-mortem blood-alcohol level. The presiding justice's response was to point out that the prosecutor was bound to argue only those matters which were in evidence.

During his summation the prosecutor referred to the appellant's blood-alcohol level in the following manner:

Again, who are you going to believe? Are you going to believe Roy Dana when he told you he had that amount to drink? Doesn't Dr. Young's analysis assist you in deciding whether or not Mr. Dana was being frank with you? Because if he had consumed all that alcohol that he said he had consumed, his blood-alcohol would have been a .86.

Contrary to assertions by the appellant we are unable to find anything inappropriate within this portion of the prosecutor's argument. The theoretical level of the appellant's blood-alcohol was based upon his own testimony regarding his consumption of beer and wine and was admitted into evidence *without objection*. Moreover, testimony from the chemist pertaining to the highest blood-alcohol level he had ever tested was likewise admitted without objection. The State could have properly included this testimony in its summation because the underlying facts were in the testimony. Appellant's claim that the prosecutor violated instructions not to argue the blood-alcohol estimate is unsupported by the record.

1. Defendant had been indicted for burglary (17–A M.R.S.A. § 401), theft (17–A M.R.S.A. § 353), criminal threatening (17–A M.R.S.A. § 209), and possession of a firearm by a felon (15 M.R.S.A. § 393).

## II

The defendant was a witness. He described the quantities of beer and wine he consumed on the day in issue and claimed he had no memory of succeeding events after "getting to Beth's house," testifying, "I lost [my memory] after that." On cross-examination he answered "No" when asked: "You're not in a position to say that these crimes were not committed or that you didn't commit them, are you?"[2]

From the defense testimony, if believed, it would have been rational to infer that the defendant had consumed thirty-eight 16-ounce bottles of beer and three "fifths" of wine, all within a 13-hour period prior to his arrest.

John A. Ordway, M.D., Chief of Psychiatry at the Eastern Maine Medical Center, testified for the defense, characterizing the defendant's history as "compatible with a severe passive-aggressive personality."[3] On the basis of the defense testimony as to the quantity of defendant's alcoholic consumption, the doctor stated, "I don't believe that [Dana] could form any criminal intent to do anything as complicated as he is accused of."

On cross-examination it developed that the defendant's only serious interview with Dr. Ordway lasted slightly over two hours. Also, the doctor was able to repeat statements made to him by the defendant. These statements were inconsistent with the defendant's trial testimony that he had "lost" his memory at "Beth's house." The doctor quoted defendant as saying, for example, "I don't remember hearing the glass break clearly but I remember there were cars and I knew it was cops and I remember going out the window and I had two guns with me."

The police officers who arrested the defendant after a short but hot pursuit testified concerning his relative state of sobriety. One stated:

It appeared to me that he'd been drinking. Fairly stable on his feet, the walking didn't indicate a severe drinking . . . .. At the station there was an odor of intoxicating liquor about his breath as he talked. He seemed to sit upright in the chair, not have coordination problem of any great extent. . . .

. . . .

. . . He didn't seem to be lost or disoriented as to where he was.

The other officer testified: "I smelled an odor of liquor but as far as I was concerned he was in complete control of his motor functions."

With this background we now consider this portion of the prosecutor's *rebuttal* argument,[4] part of which is claimed to be prejudicial.

[Defense Counsel] would ask you to believe that pulling a trigger on a gun is not a rational act especially when it's pointed at a police officer. The State is not saying that Mr. Dana was rational, nor do we have to prove that. If that gun had been loaded, ladies and gentlemen, that perhaps would not have been a rational act but we do not have to prove that it's rational.

How can you prove somebody's intent? There is no way of putting a microscope to anybody's head and looking through it and seeing what is in that man's mind. The only way to decide somebody's intent is to do it by his actions. If I were to pick a rock up off this floor and throw it through that window, you could assume from my actions and it would be reasona-

---

2. There was clear evidence of a burglarious entry into an Old Town store. After hot pursuit by the police, who had been called immediately, the defendant was apprehended and a stolen pistol was removed from his possession. This was at "approximately two o'clock in the morning." The store owner identified the pistol as having been in his stock before the burglary.

3. "Passive when sober and aggressive in one way or another when drinking."

4. The record does not contain the arguments in chief so we have no way of knowing whether the defense argument prompted the quoted comments.

ble for you to decide that what I intended to do was break that window with a rock. Now the Defendant could get on the stand and say, I had no such intent, but that's for you to believe or disbelieve him.

The State would draw an analogy between what Mr. Dana and Dr. Ordway had going in that office; *Dr. Ordway being a fine, eminent doctor and Roy Dana being an Indian*, probably never met Dr. Ordway before in his life. *Dr. Ordway was probably dressed in a suit. Mr. Dana was there as a defendant.* Can you imagine how those two probably met and how they got along at the beginning? Do you think they're two people who related right off and said, gee, you and I have common backgrounds, I'm going to be able to talk to you very easily, I'll tell you all about my life. Or do you think Mr. Dana had a problem there? Was it reasonable for you to decide Mr. Dana was a little afraid of Dr. Ordway and didn't want to tell him everything?

.        .        .        .        .

Maybe that's what Mr. Dana did in this instance. Maybe he told the doctor what he wanted to remember and he forgot what he wanted to forget. Maybe he had some other motive in mind when he was talking to Dr. Ordway. *Our answer to Dr. Ordway, ladies and gentlemen, is your common sense and your collective reasoning.* [emphasis supplied].

The defendant did not object to this argument at any point, nor did he subsequently request any corrective instruction. In his brief he argues that his failure to request a curative instruction was "based upon trial strategy." The premise of his argument, however, is that the above quoted comments referred to the defendant's race "in a derogatory manner" since they compared the defendant, "being an Indian," with Dr. Ordway, a "fine, eminent doctor."

█ We would agree with the appellant that the prosecutor's injecting racially prejudicial comments in oral argument, al-

though not objected to, would be reviewable on appeal as "obvious [error] affecting substantial rights." Rule 52(b), M.R. Crim.P. If the purpose of an argument is to impugn the standing of a defendant before the jury and to intimate that such a defendant would be "more likely than those of other races to commit the crime charged," we would have no hesitancy in holding such argument to be improper and prejudicial. *State v. Torres*,[5] 16 Wash.App. 254, 257, 554 P.2d 1069, 1072 (1976); *see also State v. Tibbetts*, Me., 299 A.2d 883, 886–91 (1973).

█ The propriety of the prosecutor's argument was first called to the presiding justice's attention at a hearing on defendant's motion for a new trial. The justice denied the motion, stating:

> The Court certainly would make clear that ordinarily any reference to matters of a defendant's race or sex or educational level or any other circumstances not relevant to the proceedings before the Court would be improper argument.
>
> The Court is satisfied that there was no such intended or, in fact, accomplished reaction to the remark made by [the prosecutor] that would warrant granting a new trial. I don't think the term was necessary to the argument being made and I think [the prosecutor] acknowledged that the use of the term was inadvertent. However, the Court is satisfied it was not as prejudicial as would require granting the Motion.

We limit our review of the foregoing ruling to a determination of whether the appellant has demonstrated a clear abuse of judicial discretion. Without the benefit of having heard and seen the witnesses, the attorneys and the reactions of the jurors, we have no right to substitute our factual conclusion for that of the trial justice. *Cf. Binette v. Deane*, Me., 391 A.2d 811, 813 (1978) (application of civil rules of procedure); *State v. Prudenzano*, Me., 365 A.2d 418, 420 (1976); *State v. Upton*, Me., 362 A.2d 738, 740–41 (1976) (motions for mistrials).

---

**5.** *Torres* dealt with a prosecutor's opening statement in which the defendants were referred to "a number of times" as Mexicans, or Mexican-Americans.

We find no abuse of discretion.

Counsel for the appellant conceded in his argument for a new trial that the fact the appellant is an American Indian was apparent to the jury in various ways. Defense counsel, in fact, repeatedly asked questions from which one would reach a definite conclusion regarding the appellant's race.[6] The prosecutor's remark concerning the appellant's ethnic origin could only be harmful, therefore, if he attempted to vilify or excite disapprobation of the appellant on account of his race. A review of the prosecutor's argument in that context convinces us that neither was the case.

The basic thrust of the quoted argument was aimed at the validity of Dr. Ordway's ultimate conclusion concerning appellant's criminal intent, not at the defendant's race or his credibility as a witness. The strongest point made in defense came from Dr. Ordway in his assertion that the defendant could not "form any criminal intent" to commit the several crimes. Since Dr. Ordway's opinion was necessarily influenced by his single two-hour interview with the defendant, the prosecutor was arguing, in substance, that his testimony would not be as reliable as that of the police officers who actually saw the defendant moments after the burglary had been committed, and were there when the defendant pulled the trigger on what, fortunately, developed to be an unloaded pistol.

This is a far cry from the factual backgrounds of cases where the jury has been exposed to highly prejudicial arguments by a prosecutor's calculated resort to racial prejudice. *See, e. g., Miller v. North Carolina,* 583 F.2d 701, 704 (4th Cir. 1978) (rape prosecution in which counsel for the State made repeated references to "these black men" and in his opening remarks stated, "[T]he average white woman abhors anything of this type in nature that had to do with a black man. It is innate within us . . . .");  *United States v. Grey,* 422 F.2d 1043, 1045 (6th Cir. 1970) (Prosecutor asked character witness in a bank robbery trial whether he knew the defendant, a married black man, was running around

6. [Defense Counsel]: Will you please for the Court and the jury state your full name and your address if you have one?
[Appellant]: My name is Roy Dana and I live on Indian Island in Old Town.
[Defense Counsel]: And was there anything significant or particular that happened to you or occurred in your lifetime three or four years ago when you feel you had started a severe drinking problem that caused this or you feel contributed to this? . . .
[Appellant]: I had a girl friend on the reservation and I went with her for about four years.
[Defense Counsel]: Now the reservation is where?
[Appellant]: Indian Island.
. . . . .
[Defense Counsel]: And then what happened?
[Appellant]: Well, I got married when I was eighteen.
[Defense Counsel]: To another girl?
[Appellant]: To another girl in Princeton.
. . . . .
[Defense Counsel]: Is there an Indian reservation in Princeton, Maine . . . ?
[Appellant]: Yes.
[Defense Counsel]: And you met a girl . . who lived on the reservation at Princeton?
[Appellant]: Right . . . .
[Defense Counsel]: So you attempted and your wife attempted to help you with some alcohol rehabilitation?
[Appellant]: Yes.

[Defense Counsel]: And where was this?
[Appellant]: It was in Calais, Maine.
[Defense Counsel]: Up where you lived on the reservation?
[Appellant]: Right.
. . . . .
[Defense Counsel]: Where did you go when you got out of the Correctional Center? . .
[Appellant]: On the reserve.
[Defense Counsel]: Where, where is that?
[Appellant]: In Old Town.
[Defense Counsel]: On Indian Island?
[Appellant]: Right.
. . . . .
[Defense Counsel]: Where did your sister live?
[Appellant]: Oak Hill.
[Defense Counsel]: Where is Oak Hill?
[Appellant]: On the reserve in Old Town.
. . . . .
[Defense Counsel]: Do you have a mother on Indian Island?
[Appellant]: Yes.
[Defense Counsel]: Were there any efforts by anyone on the island, any of the Indian officials, to help you get a job?
[Appellant]: Yes.

with a white go-go dancer); *State v. Torres*, 16 Wash.App. 254, 256, 554 P.2d 1069, 1071 (1976) (rape trial in which prosecutor referred to complainants as "Ms." and "Mrs." and defendants as "Mexicans" or "Mexican-Americans").

The prosecutor's inartful portrayal of the differing backgrounds of the psychiatrist and the appellant seems to have been neither an attempt to inflame latent prejudices against American Indians (if such exist, in fact), nor an effort to castigate "fine, eminent doctors." Nor can we say on the basis of the record before us that the presiding justice erred in concluding that such had not, in fact, been the result.[7] We should act with restraint and caution when asked, as we are in this case, to review a ruling by an able and experienced justice who almost daily presides over jury trials and would have knowledge of the atmosphere of the trial and a fundamental sense of its fairness.

Although in this instance it has not been demonstrated that the ill-advised, albeit unintentional, remarks of the prosecutor were prejudicial, we must caution prosecutors to exercise care in their advocacy.

> The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape nor innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).

The entry is:

Appeal denied.

Judgment affirmed.

DELAHANTY, J., sat at oral argument and conference but retired prior to the preparation of the opinion. He has joined the opinion as Active Retired Justice.

---

7. Since the ultimate issue in the case of a disputed remark by the prosecutor is whether the remark was so prejudicial as to deprive the defendant of a fair trial, each case must be decided upon its own facts. Whether the remark was prejudicial at all or totally insignificant are matters that can be determined only within the context of the complete trial. *Miller v. North Carolina*, 583 F.2d at 707.