MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2016 ME 102
Docket:       Pen-15-414
Argued:       May 3, 2016
Decided:      July 12, 2016

Panel:        SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and
              HUMPHREY, JJ.

STATE OF MAINE

v.

RANDALL DALUZ

ALEXANDER, J.

[¶1]   Randall Daluz appeals from the trial court's (Penobscot County, *Anderson, J.*) denial of his motion for a new trial following his conviction after a jury trial of three counts of murder, 17-A M.R.S. § 201(1)(A) (2015), and one count of arson (Class A), 17-A M.R.S. § 802(1)(A) (2015).   In his motion for a new trial, Daluz argued that statements made by counsel for his co-defendant, Nicholas Sexton, had impermissibly commented upon Daluz's race and his decision not to testify.   Because we conclude that the trial court did not abuse its discretion when, after evaluating the entire record, it denied the motion for a new trial, we affirm.

2

## I.  CASE HISTORY

[¶2]  Viewing the evidence in the light most favorable to the State, the following facts are supported by the trial record.  *See State v. Reed*, 2013 ME 5, ¶ 9, 58 A.3d 1130.

[¶3]  On August 13, 2012, around 3:30 a.m., a white 2001 Pontiac Grand Prix[1] was discovered burning in a Bangor industrial park.  The bodies of Daniel Borders, Nicolle Lugdon, and Lucas Tuscano were inside the car.  Borders and Lugdon had each died of a single gunshot wound to the head; the bullet entered behind the left ear of each victim.  Tuscano's head was badly damaged by the fire, but the Deputy Chief Medical Examiner was able to determine that Tuscano had died from head trauma.

[¶4]  On August 11, 2012, in Rhode Island, Nicholas Sexton had renewed a rental agreement on that same Pontiac Grand Prix.  Later that day, Sexton picked up his friend, Daluz, in Massachusetts.  Daluz told his girlfriend he was going "to work."

[¶5]  The night of August 11, at a hotel in Brewer, Sexton and Daluz met with Borders and his girlfriend, who was also Lugdon's sister.  Borders and Lugdon's sister had a history of purchasing drugs from Sexton and Daluz, which

---

[1]  Trial witnesses referred to the car as a Pontiac Grand Am at various points in the record, and both the State and Daluz refer to it as a Grand Am on appeal.  The rental agreement and the person who rented the car to Sexton stated that it was a Grand Prix.  The distinction is not material to the appeal in any way.

Borders and his girlfriend then used or Borders sold to others. For a time prior to August 2012, the couple had been making fewer drug buys from Sexton and Daluz because Lugdon was supplying the couple with a less expensive and better quality product.

[¶6] During the August 11 meeting, Sexton and Daluz displayed cocaine, heroin, and Percocet for sale. There were two guns on the bed—a silver gun with a rounded barrel and a smaller, darker gun with two holes. Sexton put the silver gun under his shirt; Daluz played with the smaller gun. Borders and Lugdon's sister bought some cocaine from Sexton and Daluz "[j]ust to keep them happy," but they purchased less than they usually did and did not buy any Percocet. Towards the end of the meeting, Lugdon's sister felt that "it got a little hostile," and Sexton cornered her and demanded to know where Lugdon "was getting her stuff." At that point, Borders and Lugdon's sister left.

[¶7] The next day, on August 12, Sexton and Daluz went to a house in Dedham to pick up a friend. The friend rented a room above the garage, and the homeowner lived in the house. Sexton and Daluz had previously visited that residence. Sexton drove Daluz and the friend to Bangor in the Pontiac. At Sexton's request, the friend booked Sexton and Daluz a room at the Ramada Inn in Bangor for the night. The three men eventually went to a Bangor bar called Carolina's Sports & Spirits.

4

[¶8]   That same evening, Lugdon and Borders were at an apartment on Bolling Drive in Bangor selling drugs.  They were trying to locate Percocet for a customer, and Borders called and texted Sexton to obtain the drug.  Tuscano arrived at the home with Percocet for the customer.  Borders then texted and eventually called Sexton to tell him that they did not need the Percocet anymore.

[¶9]   At the bar, Sexton and Daluz's friend observed Sexton to be "pissed" after his phone call with Borders.  Sexton and Daluz left the bar sometime around 10:30 or 11:00 p.m. in the Pontiac.  Sexton told the friend that he and Daluz would "be right back," but they did not return to the bar.

[¶10]  Around 11:00 p.m. on August 12, there was a knock on the front door of the apartment on Bolling Drive.  One of the apartment's two tenants answered the door, and Sexton, whom the tenant did not recognize, was alone in the doorway with his sweatshirt hood up and drawn.  Sexton told her his name was "Mike," but Lugdon and Borders identified him as Sexton.  Sexton asked Borders to "go smoke a blunt" with him.  Lugdon invited herself to join them, and she convinced Tuscano to come along.  The other tenant witnessed Sexton and the three victims leave in the Pontiac.  The tenant did not see Daluz, but it was dark and he could not see into the car.

[¶11]  Shortly after the victims left the house with Sexton, the tenants called and texted Lugdon and Borders when other people arrived at the house to buy

drugs. Neither Lugdon nor Borders ever answered. After about fifteen to twenty-five minutes, calls to their cell phones started going straight to voicemail.

[¶12] At 11:02 p.m., Borders sent Sexton a text message: "Dude what's going on man is some thing up." At 11:06 p.m., Lugdon's cell phone connected to the cellular network for the last time, using a cell phone tower that serviced the Bolling Drive area.[2] At 11:16 p.m., Borders's cell phone had its last connection to the network, using a tower located in Old Town.[3]

[¶13] After 11:00 p.m. that night, until around 3:32 to 3:37 a.m., Sexton's and Daluz's cell phones were using the same or nearby cell phone towers. Around 11:00 p.m., both of their phones were using towers that service Bolling Drive. At 11:06 and 11:08, their phones were moving away from that area. Their phones

---

[2] The State called a member of the Federal Bureau of Investigation's Cellular Analysis Survey Team at trial. He testified that every phone call made and every text message sent on a cellular telephone is recorded on the cellular network that the phone utilizes to make the call or send the message. When a call is made or received, a signal travels from the phone to the cell phone tower, or vice versa. A cell phone tower has multiple structures affixed to it with antennae pointed in different directions, so that the tower can send and receive data in different directions. These sections of the tower are called sectors, and which sector is used indicates in what direction from the tower the phone is located. The expert used the term "cell site" to describe cell phone towers, perhaps because some "towers" are smaller and affixed to other structures, such as buildings or water towers. Cell site ID numbers, on the other hand, indicate "a cell site and a cell site sector."

When a phone is not in use and is waiting to receive a call, it "examin[es] the cellular network and . . . read[s] the available cell sites that are available to it." The phone essentially ranks the cell sites available by order of quality of signal, so that if a call comes in and the network "pages" the phone that it has a call, the phone will receive the call via what the phone's program determines to be the best cell site. Normally, the best cell site is the one physically closest to the cell phone. The expert testified that "the originating cell site is extremely telling geographically of where a person is because, again, it's what the phone chose."

[3] Tuscano's phone had last connected to the network earlier that night, at 10:18 p.m., after he sent a text message indicating that his phone's battery was running out of power.

6

next used towers in Old Town, then Holden, then Dedham. The phones kept using the Dedham tower from 11:50 p.m. until 12:32 a.m.

[¶14] Sometime that night, the owner of the house in Dedham where Sexton and Daluz's friend lived saw a car slowly drive past the house. A few days later, he noticed that a blue can of diesel fuel was missing from the garage. The burned Pontiac contained remnants of a blue container and remnants of a "heavy petroleum distillate," specifically a "diesel range product."

[¶15] Around 12:38 a.m., Sexton's and Daluz's cell phones began moving back toward Bangor. Between 1:15 and 1:50 a.m., both phones were using a tower in Bangor near the Bangor International Airport. Around 2:45 a.m., Daluz called their friend and asked for the room number of the room he had booked at the Ramada Inn. From 3:02 to 3:21 a.m., Sexton's phone used towers near the industrial park where the burning Pontiac was discovered. From 3:03 to 3:25 a.m., Daluz's phone used towers servicing the Ramada Inn. Phone records demonstrate that Sexton and Daluz were communicating with each other by phone from 3:03 to 3:32 a.m.

[¶16] Around 3:07 a.m., surveillance cameras at the industrial park captured the Pontiac driving into the lot. Around 3:13 a.m., a person moved quickly away from the car, and moments later the car was visibly ablaze.

[¶17]   Between 3:32 and 3:37 a.m., Sexton's phone began using towers servicing the Ramada Inn.  During that time, Daluz's phone began moving away from the Ramada Inn area, eventually registering at a tower servicing First Street in Bangor.  Around 3:30 a.m., a taxi driver picked up Daluz at the Ramada Inn and dropped him off at a friend's house on First Street.  He arrived at his friend's house with a bag of laundry, which he washed at some point while he was there.  A day or two later, Daluz left Bangor for Massachusetts.

[¶18]   Later in the morning of August 13, Sexton called his girlfriend and asked her to bring their children to Maine, citing it as an opportunity for them to spend time together.  When Sexton's family arrived at the Ramada Inn, Sexton appeared to be "upset," and instead of the family staying overnight, they ordered dinner in the hotel room and then all left Bangor together.

[¶19]   In March 2013, months after these events, a man was using a metal detector on the bank of the Penobscot River in Bangor.  There, he discovered two firearms (a Davis Industries D32 derringer pistol and a Jimenez JA-380 pistol),[4] several rounds of ammunition, and a cell phone.  Sexton had purchased the derringer from an acquaintance sometime before the shootings.  A forensic specialist from the Maine State Police Crime Lab concluded that the bullet

---

[4]  The jury saw both firearms at trial.  The derringer matches the description of the gun Lugdon's sister described Daluz as touching the day before the murders, and the Jimenez matches her description of the gun Sexton put under his shirt.

8

recovered from Lugdon had been fired from the bottom barrel of the derringer. He was unable to conclude that the bullet fragments recovered from Borders had been fired from the Jimenez, but he was unable to rule the gun out either.

[¶20] In September 2012, Daluz was indicted on three counts of murder, 17-A M.R.S. § 201(1)(A), and one count of arson (Class A), 17-A M.R.S. § 802(1)(A). He entered pleas of not guilty. Sexton was similarly indicted, and the State elected to try Sexton and Daluz together. *See* U.C.D.R.P.–Bangor 8(b) (2014) (repealed 2015); M.R. Crim. P. 8(b) (2014) (repealed 2015).[5]

[¶21] In June 2013, Daluz moved for relief from prejudicial joinder, arguing that he would be prejudiced by a joint trial with Sexton. *See* U.C.D.R.P.–Bangor 8(d) (2014) (repealed 2015); M.R. Crim. P. 8(d) (2014) (repealed 2015). Initially, after a hearing, the court granted the motion, determining that there would be a "*Bruton* problem" if the defendants were tried together by a single jury, referencing *Bruton v. United States*, 391 U.S. 123 (1968). The court's decision was based on the State's representation that it planned to introduce at trial incriminating out-of-court statements made by Daluz, implicating himself and

---

[5] These proceedings occurred before the Maine Rules of Unified Criminal Procedure (effective January 1, 2015) were implemented in Penobscot County. *See* M.R.U. Crim. P. 1(e)(1).

Sexton in the crimes.[6]  Daluz had made the statements to law enforcement officers

and to a cellmate after his indictment and arrest.

[¶22]    Pursuant to M.R. Evid. 801(d)(2),[7] the statements would be

admissible against Daluz but not against Sexton, and a joint trial by a single jury

would therefore run afoul of the United States Supreme Court's holding in *Bruton*

if the statements were admitted, *see Bruton*, 391 U.S. at 126.   After the court's

initial grant of the motion for relief from prejudicial joinder, the State informed the

court that it would not introduce Daluz's statements.    The court then denied

Daluz's motion for relief from prejudicial joinder and ruled that the defendants

would be tried together by one jury.

[¶23]  The defendants proceeded to a joint trial that began on May 1, 2014.

Two attorneys represented each defendant.[8]   The record on appeal contains jury

selection transcripts, which indicate that potential jurors were asked to fill out a

---

[6]  The record indicates that the State was planning to offer statements that Daluz had made to law enforcement officers and to a cellmate while Daluz was in custody awaiting trial.  The record indicates that, days after Daluz was indicted for the murders and arson, he was arrested by Massachusetts police and voluntarily gave a statement to Maine detectives.  Allegedly, he told police that Sexton had dropped him off at a friend's house in Dedham before Sexton collected the victims from the house on Bolling Drive, and that Borders and Tuscano were already dead when Sexton returned to pick up Daluz.  Daluz allegedly told police that he then witnessed Sexton kill Lugdon, and that Daluz convinced Sexton not to kill Daluz.  Once incarcerated, Daluz allegedly made statements to a cellmate indicating that he, not Sexton, had shot Lugdon, in order to "solidify Sexton's trust."

[7]  Rule 801 has since been replaced by the restyled Maine Rules of Evidence, which took effect on January 1, 2015.  The meaning of the prior rules was unchanged by the restyling.  Introductory Advisory Committee Note to the Restyled Maine Rules of Evidence.

[8]  Daluz is represented by different counsel on appeal.

confidential questionnaire, under oath, to aid the court and parties in selecting jurors who were "free of any bias . . . [or] prejudice." Although a copy of the questionnaire does not appear in the record, the jury selection transcript indicates that one of the questions "concern[ed] attitudes toward race and whether any of that could cause a person to be unable to be fair and impartial." The record indicates that Sexton is white and Daluz is black. No issue regarding jury selection or the composition of the jury is presented on appeal.

[¶24] On the first day of the trial, the parties presented opening statements. The jurors then were taken to view the industrial park, the Ramada Inn, the house on Bolling Drive, Carolina's Sports & Spirits, and an intersection near the Penobscot River. The State presented its case-in-chief over eleven days.

[¶25] On the thirteenth day of trial, Sexton testified, implicating Daluz in all four crimes and attempting to contradict the State's evidence to the extent that it implicated Sexton. Sexton testified that during a struggle in the car, Daluz shot Borders accidentally and then shot Tuscano without warning. Sexton testified that he was afraid of Daluz and drove where Daluz directed him to go. Sexton testified that he and Daluz stole what they believed was gasoline from the house in Dedham, and then Sexton drove them to Hermon where he and Daluz got out of the car. Sexton testified that Daluz threatened to kill Sexton and his children if Sexton told anyone what had happened. Then, Sexton testified, Daluz shot Lugdon

through a broken window in the car with the derringer while aiming the Jimenez at Sexton. Sexton testified that he burned the car and bodies because Daluz threatened to kill him if he did not do so. Sexton's testimony regarding the way that Borders and Lugdon were shot was not consistent with the medical evidence, which indicated that Borders and Lugdon were each killed by a single shot behind the ear.

[¶26] On the fourteenth day of trial, Daluz presented three witnesses and elected not to testify himself. That same day, the parties made closing arguments. Sexton's closing argument included a theme that the State wanted the jury to use "poetic license" to fill in the parts of its story where the State was unable to produce direct evidence of what had happened. Sexton asked the jury to compare the State's "poetic license" with his testimony. We discuss Sexton's closing argument in more detail in our legal analysis below.

[¶27] Immediately after Sexton concluded his closing argument, Daluz stated at a bench conference that he was "fil[ing] an objection" to two statements made by Sexton's counsel asking how Daluz would "explain" something, arguing that the statements implicated Daluz's right to remain silent. Daluz's counsel did not raise any other issue related to Sexton's closing argument. The court offered to give a curative instruction regarding the "explain" comments, but Daluz made a strategic decision to decline a curative instruction. He also strategically chose not

to move for a mistrial, instead deciding to await the jury's verdict. With no request for judicial action pending, the court concluded the bench conference.

[¶28] The court instructed the jury at length on the same day as the closing arguments. The jury was instructed that a defendant does not have to testify and that the jury could not draw any inference from a defendant's decision not to testify. The court instructed that the jurors could not allow "any feelings of prejudice . . . [to] play a part in [their] verdict." It further instructed the jury that the statements of the attorneys, including their closing arguments, were not evidence, and that the jurors' memories of the evidence controlled over what the attorneys had argued. The court's instructions also included the elements of the crimes charged, stated that either defendant was guilty of a crime charged if he acted as the other defendant's accomplice in the commission of that crime, *see* 17-A M.R.S. § 57(3)(A) (2015); *State v. Linscott*, 520 A.2d 1067, 1068-70 (Me. 1987), and stated that the jury was obligated to consider the evidence and the instructions separately as to each defendant and to reach a separate, independent verdict as to each charge and each defendant.

[¶29] The next day, the court asked Daluz for clarification regarding whether he was moving for a mistrial based upon Sexton's closing argument. Daluz, through counsel, stated that he was not moving for a mistrial.

[¶30]  The jury deliberated from May 21 to May 28, 2014, at which point the jury indicated that it was deadlocked on two charges: the charges that Sexton had murdered Borders and Tuscano.  With agreement of the parties, the court found a manifest necessity and declared a mistrial on those two charges.  *See State v. Landry*, 600 A.2d 101, 102 (Me 1991).  The jury found Daluz guilty of all three murder charges and the arson charge.  It found Sexton guilty of the murder of Lugdon and the arson charge.

[¶31]  In June 2014, Daluz filed a motion for a new trial, arguing that he had been deprived of due process by being tried jointly with Sexton and by Sexton's closing argument.  In part, he argued that Sexton's counsel had impermissibly (1) commented on Daluz's decision not to testify; (2) argued that Daluz was more likely than Sexton to have carried the murder weapons because of their respective races; and (3) suggested that Daluz had dangerous friends who were members of minority races.

[¶32]  After a hearing in April 2015, the court denied the motion by a written order on July 8, 2015.  The court applied the obvious error review standard to the race-related comments because Daluz had not objected to them, and it concluded that the comments constituted plain errors but that they did not affect Daluz's substantial rights.  The court applied the harmless error review standard to the silence-related comments and determined that the comments were ambiguous

14

remarks that could be construed by the jury as commenting on Daluz's silence, but it determined that it was clear beyond a reasonable doubt that the jury would have returned the guilty verdicts even if the comments had not been made. Finally, the court determined that the cumulative effect of the improper comments had not deprived Daluz of due process.

[¶33] In July 2015, the court sentenced Daluz to three concurrent life terms of imprisonment for the murder convictions and a concurrent twenty years of imprisonment for the arson conviction. Daluz filed this timely appeal.[9]

## II. LEGAL ANALYSIS

[¶34] We address Daluz's arguments in turn.

### A. Motion for Relief from Prejudicial Joinder

[¶35] Daluz argues that Sexton's improper closing argument constitutes "conclusive proof" that the court abused its discretion by denying his motion for relief from prejudicial joinder before the trial began. He does not argue that there was any error in the denial of his motion to sever his trial from Sexton's separate and apart from his challenges based on what actually occurred during Sexton's closing argument.

---

[9] Daluz also applied for leave to appeal from his sentence. 15 M.R.S. §§ 2151, 2153 (2015); M.R. App. P. 20(a). The Sentence Review Panel denied his application in October 2015. 15 M.R.S. § 2152 (2015); M.R. App. P. 20(f).

[¶36]  A court may order relief from prejudicial joinder "[i]f it appears that a defendant . . . is prejudiced . . . by the joinder of defendants."  U.C.D.R.P.–Bangor 8(d); M.R. Crim. P. 8(d).  Such relief may include severance of the defendants or simultaneous trials.  U.C.D.R.P.–Bangor 8(d); M.R. Crim. P. 8(d).  "The decision on whether to sever a trial of one defendant from another lies in the sound discretion of the trial court."  *State v. Boucher*, 1998 ME 209, ¶ 9, 718 A.2d 1092.  "[J]oinder is the rule rather than the exception; the party moving for severance bears the significant burden of showing that joinder is so prejudicial that it outweighs the benefits associated with joinder—namely, judicial economy and swift resolution of the charges."  *State v. Olmo*, 2014 ME 138, ¶ 12, 106 A.3d 396.  "We review the court's decision to deny a motion for severance for an abuse of discretion and will not vacate a decision to deny a motion unless the case is one in which the potential for confusion or prejudice is obviously serious."  *Id.* ¶ 10 (alteration omitted) (quoting *State v. Lemay*, 2012 ME 86, ¶ 22, 46 A.3d 1113).

[¶37]  The court did not abuse its discretion by denying Daluz's motion to sever his trial from Sexton's.  On appeal, Daluz does not attempt to demonstrate error at the time of the court's decision on the motion to sever—instead, he states that he "assigns error to the trial court's denial of his motion for a new trial."  Daluz's argument related to severance is entirely focused on what actually

happened at trial, which was after the court ruled on the motion to sever. Procedurally, there is a distinct window of time to decide whether two defendants' cases should be severed: a defendant must demonstrate *prior to trial* that severance is necessary.[10] *E.g.*, *State v. Williams*, 2012 ME 63, ¶ 22, 52 A.3d 911; *State v. Lakin*, 2006 ME 64, ¶ 8, 899 A.2d 777; *Boucher*, 1998 ME 209, ¶ 9, 718 A.2d 1092. What actually occurred at trial is irrelevant to determining whether a trial court abused its discretion in a pretrial ruling on a defendant's Rule 8(d) motion that the defendant did not renew during the trial.

[¶38] We turn now to Daluz's principal contention: that the trial court erred in its denial of his motion for a new trial based upon Sexton's closing argument.

B.      Motion for New Trial: Preservation and Standards of Review

[¶39] During Sexton's closing argument, Daluz's trial counsel apparently identified what they believed were concerning statements by Sexton's counsel referencing, by implication, Daluz's race and his choice not to testify. Recognizing these statements, Daluz's counsel also made strategic choices to (1) not object to the concerning statements during Sexton's closing argument,[11]

---

[10] "Once a joint trial commences, the presiding justice has a continuing duty to keep a watchful eye over the proceedings and to order a severance if prejudice does appear." *State v. Anderson*, 409 A.2d 1290, 1297 n.5 (Me. 1979). Here, as we discuss in the body of our opinion, no such prejudice appeared.

[11] Maine practice has suggested that ordinarily an objection to an argument believed to be improper should be presented at the time the improper argument is made, so that the court may take reasonable steps to correct any problem at the time the problem occurs. *See State v. Dolloff*, 2012 ME 130,

(2) object after closing argument to only two of the statements, (3) decline the court's offered curative instructions, and (4) decline to seek a mistrial until after the jury's verdict. Only then did Daluz request a new trial, and only then did he raise the alleged impropriety of the majority of the statements.

[¶40] In this appeal, Daluz's primary complaints are directed at these strategic choices. The choices by trial counsel must be evaluated in light of the totality of the circumstances as they existed at the conclusion of the trial. Daluz's race was apparent, and the jurors had been questioned and selected based on their commitment to be fair and impartial regarding race. Further, the jurors were instructed not to decide the case based upon any feelings of prejudice. Daluz's choice not to testify was likewise apparent, and following Sexton's counsel's comments, the court specifically instructed the jurors that they could draw no inferences from a defendant's choice not to testify.

---

¶ 39 n.11, 58 A.3d 1032; *State v. Boone*, 563 A.2d 374, 377 (Me. 1989). This practice may present a dilemma for counsel concerned that objecting during an argument may draw the jury's attention to an adverse statement that, without an objection, would receive less attention from the jury. *See Dolloff*, 2012 ME 130, ¶ 39 n.11, 58 A.3d 1032 (suggesting in dictum that counsel "may wait a short time [to object] in order not to 'throw the skunk into the jury box.'"). To reduce that concern and others, the United States Court of Appeals for the First Circuit has adopted a practice of assuming, *arguendo*, that an objection to closing argument is preserved if brought to the court's attention promptly after argument is completed. *E.g.*, *United States v. Potter*, 463 F.3d 9, 23-24 (1st Cir. 2006); *see also Maine Jury Instruction Manual* § 5-7 at 5-19 (2016 ed.). We need not address here the issue of when an objection to a closing argument must be made, because the "objection" that Daluz did make after Sexton's closing argument failed to request any relief whatsoever, as we discuss in the text of this opinion.

[¶41]   As the circumstances existed at trial, Daluz's counsel's strategic choices to decline any curative instruction and to defer seeking a mistrial until after the verdict appear entirely reasonable to the extent revealed in this record:

- Witnesses did not see Daluz when the three victims left the house on Bolling Drive with Sexton.

- The evidence indicated that Sexton, not Daluz, had communicated with the victims that night and had expressed anger regarding at least two of the victims.

- No one except Sexton testified that Daluz was with the victims, or involved with the theft of the diesel fuel, or in the Pontiac, at any time during the approximately four hours when the crimes were committed.

- Sexton testified that the murders had been committed in a manner inconsistent with the physical evidence and the expert testimony offered by the State—testimony that could have been viewed as damaging to Sexton's assertions and his credibility.

- Besides Sexton's self-serving testimony, the only other evidence of Daluz's location during the critical times was cell tower data regarding the location of his cell phone.

- The remaining evidence of Daluz's involvement—for example, that he went to a friend's house to do laundry after the murders—was entirely circumstantial.

- And, had a mistrial been declared as to Daluz, all the evidence presented in the trial could have been presented in a subsequent trial in which the State also would have been free to utilize Daluz's own incriminating statements that the State agreed not to offer in the joint trial because of the *Bruton* issue.

[¶42]  The trial that occurred, without Daluz's incriminating statements, could reasonably have been viewed by counsel as Daluz's best opportunity to avoid criminal responsibility for some or all of the charges.

[¶43]  Despite trial counsel's strategic choices, Daluz now argues that the trial court abused its discretion by denying his motion for a new trial because certain statements made by Sexton's counsel during closing argument impermissibly commented upon Daluz's silence and race.  As a preliminary matter, we address the appropriate standards of review for these issues.

1.      Standard of Review for Decision on Motion for New Trial

[¶44]  Upon a motion by a defendant, the court may order a new trial "if required in the interest of justice."  U.C.D.R.P.–Bangor 33 (2014) (repealed 2015); M.R. Crim. P. 33 (2014) (repealed 2015).  We review the trial court's decision on a

motion for a new trial for an abuse of discretion and any findings underlying its decision for clear error. *State v. Carey*, 2013 ME 83, ¶ 26, 77 A.3d 471.

[¶45]   Appellate courts have long recognized that trial courts possess a greater ability to perceive the fairness of trial proceedings than can a reviewing court on appeal.  The United States Supreme Court has required that post-verdict motions be presented to the trial court to preserve issues for appeal because "the judge who saw and heard the witnesses . . . has the feel of the case which no appellate printed transcript can impart."  *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 401 (2006) (quoting *Cone v. W. Va. Pulp & Paper Co.*, 330 U.S. 212, 216 (1947)).  We review the trial court's findings and discretionary decisions deferentially for this very reason.  *See State v. Dana*, 406 A.2d 83, 86 (Me. 1979) ("Without the benefit of having heard and seen the witnesses, the attorneys and the reactions of the jurors, we have no right to substitute our factual conclusion for that of the trial justice."); *cf. State v. Logan*, 2014 ME 92, ¶ 14, 97 A.3d 121 (reviewing the denial of a motion for mistrial for an abuse of discretion due to the trial court's "superior vantage point").

[¶46]   Therefore, when we review a trial court's decision on a motion for a new trial, we necessarily review that decision with deference because of the trial court's unique ability to view the fairness of the proceedings.  *See Dana*, 406 A.2d at 88 ("We should act with restraint and caution when asked, as we are in

this case, to review a ruling by an able and experienced justice who almost daily presides over jury trials and would have knowledge of the atmosphere of the trial and a fundamental sense of its fairness.").

2.     Preservation of Claims of Improper Comments

[¶47]  On appeal, Daluz presents for our review fifteen selected comments made by Sexton's counsel over the course of his lengthy closing argument.  Daluz argues that twelve of these comments implicate his right to silence, and he argues that three constitute improper argument related to his race.  As the procedural history above indicates, Daluz brought two of the silence-related comments to the court's attention immediately following Sexton's closing argument, but he declined a curative instruction and strategically chose not to move for a mistrial. His first and only request for relief from the allegedly improper comments came in the form of a motion for a new trial after the jury had rendered its verdicts.  At that point, with the benefit of a transcript, he challenged the propriety of many other comments, including the race-related comments.

[¶48]  A preserved claim of improper closing argument is reviewed for harmless error.  *See State v. Lyons*, 1998 ME 225, ¶ 5, 718 A.2d 1102.  An unpreserved claim, however, is reviewed for an obvious error affecting the defendant's substantial rights.  *See State v. Robinson*, 2016 ME 24, ¶ 25, 134 A.3d 828.  This is the case even when the defendant alleges that the comment

or comments implicated his or her constitutional rights. *See, e.g.*, *State v. Clark*, 2008 ME 136, ¶ 10, 954 A.2d 1066 (reviewing for obvious error an unpreserved claim that a prosecutor improperly commented upon the defendant's post-arrest silence).

[¶49]  To preserve a claim of improper prosecutorial comment, defense counsel must object "within a reasonable time of the offending comments." *State v. Dolloff*, 2012 ME 130, ¶ 39 n.11, 58 A.3d 1032.[12]  The same is true when the comment was made by co-defendant's counsel.  "The requirement is to object at a time when the court retains the ability to provide a meaningful corrective instruction." *Id.*  Further, it is not enough to simply alert the trial court to the comment—counsel must request some form of relief, as the court's action or inaction is ultimately what we review on appeal. *See Robinson*, 2016 ME 24, ¶ 26, 134 A.3d 828 ("The focus of the obvious error analysis, as with any claim of error in a legal proceeding, is on action or inaction by the court.").

[¶50]  Here, Daluz, represented at trial by two attorneys, made a strategic decision to await the jury's verdict rather than move the court for a curative instruction or a mistrial regarding the two comments he noticed during Sexton's

---

[12]  We recognized an exception to the requirement that an objection to a comment be contemporaneous in *State v. Robinson*, 2016 ME 24, ¶ 34, 134 A.3d 828, when we reviewed for clear error rather than obvious error a defendant's allegation that a prosecutor had made an inappropriate gesture during the defendant's closing argument, because defense counsel was physically unable to see the gesture and it was later brought to his attention by an onlooker.  Such an exception does not apply in this case.

argument. His first and only request for relief from the allegedly improper comments came in the form of a motion for a new trial after the jury's verdict was rendered, at which point he additionally challenged many other comments. Therefore, although we review the court's decision on the motion for a new trial for an abuse of discretion, we review the effect of the challenged comments for obvious error affecting Daluz's substantial rights. *See Dana*, 406 A.2d at 86 (reviewing the effect of an allegedly racist comment during closing argument for obvious error when there was no contemporaneous objection and the comment was first challenged in a motion for a new trial, and reviewing the court's decision on the motion for a new trial for an abuse of discretion).

[¶51] When we review for obvious error, we review for "(1) an error, (2) that is plain, and (3) that affects substantial rights." *State v. Pabon*, 2011 ME 100, ¶ 29, 28 A.3d 1147. "If these conditions are met, we will exercise our discretion to notice an unpreserved error only if we also conclude that (4) the error seriously affects the fairness and integrity or public reputation of judicial proceedings." *Id.* This fourth consideration is only reached if there is an obvious error affecting the defendant's substantial rights. *Id.*

[¶52] "[A]n error affects a criminal defendant's substantial rights if the error was sufficiently prejudicial to have affected the outcome of the proceeding." *Id.* ¶ 34. The party claiming obvious error must demonstrate a reasonable

probability that the result of the proceeding would have been different but for the error. *Id.* ¶¶ 34-35. It is incumbent upon us to evaluate the claimed error "in the context of the entire trial record." *Id.* ¶ 19. When a defendant alleges multiple errors, "we review these allegations cumulatively and in context to determine whether [the defendant] received an unfair trial that deprived [him or her] of due process." *Robinson*, 2016 ME 24, ¶ 45, 134 A.3d 828.

C.    Analysis

    1.    Comments Daluz Argues Implicated His Silence

[¶53] Daluz argues that the court erred by denying his motion for a new trial based upon comments made by Sexton's counsel in closing argument that Daluz contends improperly implicated his decision not to testify.

[¶54] Comment by a prosecutor about a defendant's decision not to testify is forbidden by the United States and Maine Constitutions, which protect a criminal defendant's right not to bear witness against himself or herself. U.S. Const. amend. V; Me. Const. art. I, § 6; *Lyons*, 1998 ME 225, ¶ 5, 718 A.2d 1102. Allegations of such improper comments are analyzed as allegations of prosecutorial misconduct. *See Lyons*, 1998 ME 225, ¶ 5, 718 A.2d 1102.

[¶55] We have not yet had occasion to decide whether counsel for a co-defendant is similarly barred from commenting on the other co-defendant's decision not to testify. Other jurisdictions, however, have recognized that a

defendant's right to silence is protected against prejudicial comments by counsel for a co-defendant. *E.g.*, *De Luna v. United States*, 308 F.2d 140, 141 (5th Cir. 1962) ("In a criminal trial in a federal court an accused has a constitutionally guaranteed right of silence free from prejudicial comments, even when they come only from a co-defendant's attorney.").

[¶56] Today, we hold that a defendant's right to remain silent is protected against improper comments by counsel for his or her co-defendant regarding the defendant's decision not to testify. We decline to define the parameters of this protection beyond what the facts of this case require. Our prosecutorial misconduct jurisprudence is founded not only upon constitutional protections but also upon the special ethics of prosecutors, *see, e.g.*, *Robinson*, 2016 ME 24, ¶ 23, 134 A.3d 828, and some comments that would be improper for a prosecutor to make *may* not be improper when made by defense counsel in a case with multiple defendants, if those comments do not violate the appealing defendant's constitutional right to a fair trial.

[¶57] In this case, Daluz challenges numerous comments made by Sexton's counsel. Two of these comments included instances where Sexton's counsel asked how Daluz might "explain" something. Counsel's choice of words was poor, as it could be viewed as an ambiguous comment that Daluz could not explain his conduct during the trial. The context in which these comments were made,

however, indicates that the thrust of the comments was to argue, based on Sexton's self-serving testimony, that Daluz was panicking after shooting the first two victims, and that the "explanation" in question concerned how, at the time of the events, Daluz could explain what had happened if he were discovered in the car with the victims' bodies.

[¶58]   The other comments that Daluz challenges were instances where Sexton contrasted the State's argument of what the evidence showed with what Sexton testified had happened.  For example, one comment was this: "What is the only explanation for the broken window in the back seat?  The only explanation—don't use poetic license.  What is the only factually accurate representation you have heard here today that explains that?"   The State had noted in its closing argument that the fire had destroyed the evidence of which windows in the car had been broken during the murders.  Sexton had testified that a window in the back seat of the car had "blown out" behind Tuscano when Daluz shot him.  It was proper closing argument for Sexton to argue that the jury should accept his testimony rather than finding what the State argued the evidence demonstrated.  The complained-of comments were tied to Sexton's argument regarding the State's case, as the comment was in the example above, rather than tied to Daluz's silence.

[¶59]   Although some of Sexton's closing argument could have indirectly drawn jurors' attention to the fact that Daluz had not contradicted Sexton's

testimony, that alone does not mean that Daluz is entitled to a new trial. *See Varela Cartagena v. United States*, 397 F.2d 278, 280 (1st Cir. 1968) ("The privilege against self-incrimination of a co-defendant who does not choose to testify does not go so far as to deprive one who does so choose of effective argument in his behalf, so long as it is, as it was here, sensitive to the rights of others.")

[¶60]  Here, the trial court committed no error, let alone obvious error, when it did not give the jury a curative instruction or declare a mistrial as a result of those comments, when Daluz expressly waived a curative instruction regarding the "explain" comments and, before verdict, declined to move for a mistrial.  *See State v. Cleaves*, 2005 ME 67, ¶ 15, 874 A.2d 872 ("[A]ny other instructions were expressly waived, and there was no error, let alone obvious error, in the court not, *sua sponte*, instructing the jury on issues that may have been inconsistent with [the defendant's] trial strategy.")  The trial court did not abuse its discretion when it denied Daluz's motion for a new trial as to the silence-related comments.

2.    Comments Daluz Argues Implicated His Race

[¶61]  "Improper argument may be so prejudicial as to deny the defendant a fair trial." *State v. Hinds*, 485 A.2d 231, 237 (Me. 1984).  It is impermissible for a prosecutor to argue that, as a result of his or her race, a defendant is more likely than another person to have committed the crime charged, *Dana*, 406 A.2d at 86,

and we recognize today that the same would be true of an argument by counsel for a co-defendant.[13] This case does not involve comments of that precise nature. Here, Daluz contends that three statements made by Sexton during closing argument amounted to racially related arguments regarding who might have a motive to carry a gun and Sexton's alleged fear of repercussions if he did not agree to burn the car.

[¶62] The first statement that we review is Sexton's argument to the jury that Sexton would not have been carrying a gun on the day the victims were shot because he was "a white guy in Bangor" and he would not "need a gun to deal drugs to [his] friends." We agree that Sexton's use of the descriptor "white" might have implied to some jurors that Daluz might have felt the need to bring a gun. As the trial court stated, but for Sexton's insertion of the word "white," it would have been a legitimate argument that Sexton would not have felt the need to bring a gun to deal drugs to people that Sexton argued had been his friends.

[¶63] The other two comments Daluz references were related to Daluz's "friends." The first "friends" comment was made while Sexton was arguing that he was acting under duress when he burned the car and bodies. Counsel stated:

---

[13] Courts also guard against racial discrimination in other areas of criminal trials, such as during jury selection, *see Foster v. Chatman*, 195 L. Ed. 2d 1, 7-21 (2016) (ordering habeas corpus relief from a capital murder conviction due to racially motivated peremptory strikes), and during sentencing, *see State v. Butsitsi*, 2015 ME 74, ¶ 25, 118 A.3d 222 ("[S]entencing on the basis of racial categories or nationality, as opposed to demonstrated individual involvement and culpability, is constitutionally impermissible.").

> Now, he's killed three people. And you have kids and you know—he knows Mr. Daluz and he knows Mr. Daluz's friends that live in Brockton. And you got to understand that a lot of things are going through your mind at this point. This isn't the friend you knew. Now this. And I can imagine that when there's a gun involved, and I'm holding it and I'm pointing it at you, you're going to do what I say. I can make you do things that you wouldn't want to do. They drive back. Mr. Daluz goes into the motel room at 2:53. The entrance thing actually said 3:02, but remember the twelve minute time difference. He's there at 2:53 and my client is given—he's given a choice that he cannot refuse. Go burn the car or I'm going to kill you, and then I'll kill your kids. And you know something? You know what Sexton knows? Brockton. He can. And he did.

The second "friends" comment was made while Sexton was offering an explanation for why he did not go to the police after he and Daluz separated. There, counsel stated: "My client could not go to the police. No one would believe him. And you don't know Daluz's friends."

[¶64] The "friends" comments were improper for two reasons. First, there was no evidence presented at trial regarding Daluz's "friends that live in Brockton" at all. An attorney may not "argue[] facts not found in the [evidence]." *State v. Boyd*, 401 A.2d 157, 160 (Me. 1979). The trial court instructed the jury, however, that the argument of the attorneys was not evidence, and that only the jurors' memories of the evidence controlled. Second, when considered in conjunction with testimony that Sexton had given during trial, it is possible that a juror could draw a racially biased message from the "friends" comments. This is because Sexton had testified that he spent time in Brockton, Massachusetts, which he

described as having a primarily African American and Hispanic population. He also identified the area as being "tough." When Sexton later argued that he burned the car and did not seek help from the police because he was afraid of Daluz's "friends that live in Brockton," it is possible that a juror would have imagined that Daluz's friends who live Brockton might be African American or Hispanic, and, as Daluz contends, the argument would be playing on the "common trope" that African American or Hispanic men are violent.

[¶65] In denying Daluz's motion for a new trial, the trial court agreed with Daluz that the three race-related comments were improper for the same reasons that we have discussed. It determined, however, that the comments had not affected Daluz's substantial rights, and thus that the obvious error test was not satisfied.

[¶66] The court determined that, to the extent that an "attenuated inference" could be drawn from the gun-related comment that a person would likely be armed around people of a different race, such an argument was "dulled" by another argument by Sexton, wherein he argued that neither he nor Daluz would have brought a gun to Maine. Further, the court determined that the comment "in no way conveys the argument that Mr. Daluz must have performed the shootings because his race is more likely to commit such crimes than others." The court likewise determined that although the friends-related comments were improper, the

comments failed to indicate that the "friends" were "of a particular race nor even imply that they are black, Hispanic, or any other race."

3.   Cumulative Effect

[¶67]   The court found no obvious error affecting substantial rights in the three comments, as it had instructed the jury that the attorneys' statements were not evidence and that "bias or prejudice cannot play a role in the jury's verdict." The court also discussed the strength of the evidence against Daluz and determined that Daluz had not demonstrated a reasonable probability that the comments affected the outcome of his trial.

[¶68]   After a careful review of the trial record, recognizing that the trial court had the "knowledge of the atmosphere of the trial and a fundamental sense of its fairness," *Dana*, 406 A.2d at 88, we conclude that the court did not abuse its discretion in denying the motion for a new trial, because the comments did not constitute obvious errors affecting Daluz's substantial rights, and the cumulative effect of the comments did not deprive Daluz of a fair trial, *see Robinson*, 2016 ME 24, ¶ 45, 134 A.3d 828.

[¶69]   In conclusion, the trial court, "who saw and heard the witnesses and has the feel of the case which no appellate printed transcript can impart," *Unitherm Food Sys., Inc.*, 546 U.S. at 401, did not abuse its discretion when it denied Daluz's motion for a new trial.

The entry is:

Judgment affirmed.

---

**On the briefs:**

Jamesa J. Drake, Esq., and Rory A. McNamara, Esq., Drake Law, LLC, Auburn for appellant Randall Daluz

Janet T. Mills, Attorney General, and Leanne Robbin, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee State of Maine

**At oral argument:**

Jamesa J. Drake, Esq., for appellant Randall Daluz

Leanee Robbin, Asst. Atty. Gen., for appellee State of Maine