1998 ME 209

**STATE of Maine**

v.

**Steven T. BOUCHER.**

Supreme Judicial Court of Maine.

Submitted on Briefs June 29, 1998.

Decided Aug. 13, 1998.

Neale T. Adams, District Attorney, John M. Pluto, Asst. Dist. Atty., Caribou, for the State.

Peter S. Kelley, Christopher M. Leger, Kelley Law Offices, Caribou, for defendant.

Before WATHEN, C.J., and ROBERTS, CLIFFORD, RUDMAN, DANA, and SAUFLEY, JJ.

DANA, Justice.

[¶ 1] Steven Boucher appeals from the judgment entered in the Superior Court (Aroostook County, *Pierson, J.*) after a jury verdict finding him guilty of burglary, 17–A M.R.S.A. § 401 (1983), robbery, 17–A M.R.S.A. § 651 (1983), and theft, 17–A M.R.S.A. § 353 (1983). Boucher contends that the court abused its discretion when it decided to join his trial with that of a codefendant, and he argues that the procedures followed to protect him from the prejudice of his codefendant's incriminating statements were ineffective. We conclude that the admission of hearsay statements that incriminated Boucher violated his Sixth Amendment confrontation rights, but that the error was not obvious, and we therefore affirm the judgment.

[¶ 2] On November 27, 1992, Steven Boucher, together with his brother Scott and two others, went to the Grand Isle home of Beulah Dubois and her two sons looking for money that Beulah's husband Paul had reportedly stolen from a number of investors. Three intruders[1] first entered Beulah's apartment, forced her to the ground at gunpoint, secured her arms and legs with duct tape, and searched her apartment. They also put duct tape over the mouth of Beulah's eight-year-old grandson, who happened to be visiting that night. Two of the intruders then went upstairs to the apartment of Richard Dubois, Beulah's son, while the third kept watch over Beulah. The two forced Richard at gunpoint to lay on the floor, bound his hands and feet with duct tape, and cut his ear and nose with a knife and pushed a knife under his fingernails when he did not tell them where they could find the money they were looking for. The four men eventu-

ally fled the scene, taking with them several hundred dollars in cash, several items of jewelry, and a number of guns owned by the Dubois family.

[¶ 3] The Bouchers were each indicted in March 1995 for burglary, robbery, and theft as a result of the Grand Isle incident. The State moved to join the trials of a third defendant, Michael Abbott, and the Bouchers pursuant to M.R.Crim. P. 8. Steven opposed the motion and it was denied. After Abbott was tried and acquitted, the State moved to have Steven and Scott tried together, and the motion was granted over Steven's objection. Steven argued that joinder of his trial with Scott's would prejudice him because Scott's admissions to the crimes, which included details of Steven's involvement in the offenses charged and which would be inadmissible hearsay if offered against Steven, would be admitted during the trial against Scott and, even if redacted, would clearly implicate Steven in the crime. Prior to the trial, Steven filed a motion to sever, essentially reiterating his arguments in opposition to the State's motion for joinder. The motion was denied, and the case went to trial.

[¶ 4] At the trial, several witnesses testified regarding Scott's admissions to them of his involvement in the crimes. The court instructed the witnesses outside the presence of the jury that they were not to refer in any way to Steven Boucher when relating statements made by Scott Boucher. The witnesses complied with this instruction.

[¶ 5] Debi Theriault–Pace, Scott's girlfriend at the time of the break-in, testified that Scott told her about his involvement in the crimes. After relating some of the details of the crime as told to her by Scott, Theriault–Pace testified as follows:

Q. Okay. I want you to listen closely to my question. What did Scott tell you about Scott's involvement in the Dubois situation?

A. He stated that there was four people that were involved.

Q. I am not going to ask you at this time to name any of the—

---

1. Steven remained outside as a lookout.

A. No.

Q. Was Scott one of the four?

A. Yes.

. . . .

Q. Did he state that Tim Dumond was also one of the four?

A. Yes, he did.

Q. Did he state whether Michael Abbott was one of the four?

A. Yes, he did.

[¶ 6] Kevin O'Leary, who was dating Theriault–Pace's mother during the time Scott was dating Theriault–Pace, testified that during a family get-together Scott spoke to him regarding the break-in. Again, the prosecutor asked about the number of people involved:

Q. [D]o you remember how many other people or how many people in total Scott was talking about?

A. Four.

Q. He was one of the four?

A. Yes.

Q. Did he mention Michael Abbott was another one who was involved?

A. Yes.

Q. Did he mention that Timothy Dumond was another one who was involved?

A. Yes.

[¶ 7] Adam McBreairty, who worked with and was a friend of both Steven and Scott, testified that both brothers talked to him about the crime. He related that Steven gave him a gun and told him that it had been stolen from the Dubois residence in Grand Isle. Steven also told McBreairty that he drove the get-away car, but that he did not enter the house. Timothy Dumond, a participant in the break-in, testified for the State about the details of the crime, including Steven and Scott's involvement, after the State agreed to prosecute him only for misdemeanors. Steven Michaud testified that he met Scott Boucher while they were both living in Colorado in 1994 or 1995 and that Scott told him that "he had gone in a house looking for money and he felt bad about it." Scott did not tell Michaud whether he had committed the break-in alone or with others. Neither Scott nor Steven testified at the trial.

[¶ 8] Although Steven argued prior to the trial that evidence of Scott's admissions would unfairly prejudice his defense, he did not object to the testimony when it was offered during the trial. Nor did Steven request an instruction that Scott's admissions should only be considered against Scott and should not be considered when determining Steven's guilt or innocence. The jury found Steven guilty on all three counts and he was sentenced on the robbery count to twelve years of imprisonment with all but eight years suspended followed by six years of probation, and to six years of imprisonment on each of the burglary and theft counts to be served concurrently with the sentence on the robbery count. This appeal followed.

*Joinder For Trial*

[¶ 9] Steven first argues that the court's order that joined his trial with his brother's was an abuse of discretion because there were no changed circumstances from the time the court had denied a motion for joinder for the trials of the Bouchers and Abbott. M.R.Crim.P. 8(d) provides:

If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment, information or complaint or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires; including ordering multiple simultaneous trials.

"In making a determination on a Rule 8(d) motion, the court must balance the general policy in favor of joint trials against the prejudice to a defendant which may result." 1 Cluchey & Seitzinger, *Maine Criminal Practice* § 8.9 at III–65 (1995). The decision on whether to sever a trial of one defendant from another lies in the sound discretion of the trial court. *State v. Knight*, 623 A.2d 1292, 1294 (Me.1993). The party moving for a severance bears the significant burden of showing facts to the trial court prior to trial that would convince the court that the party would be prejudiced by a joint trial. *State v. Smith*, 415 A.2d 553, 556 (Me.1980).

[¶10] Although Steven made a clear showing of facts that *Bruton* issues would be raised at trial, the court acted within its discretion in granting the joinder and denying Steven's subsequent motion to sever. The State, by completely redacting any direct or indirect reference to Steven, could have presented Scott's confessions in a manner that was constitutionally sound and that avoided prejudice to Steven. The court explicitly considered this possibility when ruling on Steven's motion to sever the trials. Because Steven made no other assertion of prejudice that would result from the joinder for trial, he failed to meet his burden pursuant to *Smith,* and thus, the court acted within its discretion when it ordered the joinder.[2]

### Bruton Violation

[¶11] In *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court held that the introduction in evidence of a nontestifying codefendant's out-of-court confession, which stated that the codefendant and Bruton together had committed a robbery, violated Bruton's Sixth Amendment right to confront the witnesses against him, despite the trial court's clear instructions to the jury that the codefendant's confession was inadmissible hearsay with respect to Bruton and had to be disregarded in determining Bruton's guilt or innocence. *Id.* at 135–37. The Court stated:

> [T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of

the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect.... The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination.

*Id.* at 135–36.[3]

[¶12] We subsequently held that "when a witness is relating statements given to him by a defendant, a fair deletion of all references, express or implied, to any other defendant is a proper and approved method of avoiding prejudice and the *Bruton* dilemma." *State v. Wing,* 294 A.2d 418, 422 (Me.1972). The Maine Rules of Evidence, promulgated by the Supreme Judicial Court in 1976, incorporated the *Bruton* and *Wing* holdings in Rule 105, which addresses the limited admissibility of certain evidence: "In a criminal case tried by a jury, evidence inadmissible as to one defendant shall not be admitted as to other defendants unless all references to the defendant as to whom it is inadmissible have been effectively deleted." M.R. Evid. 105.[4]

[¶13] The Supreme Court revisited this issue in *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), and held, consistent with our holding in *Wing,* "that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting in-

---

**2.** Steven also argues that the court's failure to join the trials until almost a year after he was indicted unfairly prejudiced his preparation for trial, as he was required to prepare for witnesses that would not otherwise testify at his own trial. Steven did not raise his timeliness objection before the trial court, and, in any event, the timing of the joinder was within the court's discretion, especially in these circumstances, where Steven's attorney was also Scott's attorney until two months before the court ordered joinder of the trials, and the trial was held three and one-half months after the trials were joined. *See State v. Saucier,* 385 A.2d 44, 46 (Me.1978).

**3.** *Bruton* explicitly overruled *Delli Paoli v. United States,* 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278

(1957), which had held that a defendant received sufficient protection from the admission in evidence of a codefendant's confession when the court gave the jury sufficiently clear instructions to disregard the confession with respect to the defendant and when it was reasonably possible for the jury to follow the instructions. *Id.* at 239.

**4.** The *Bruton* requirements are also addressed in the last sentence of Rule 804(b)(3): "A statement or confession offered against the accused in a criminal case, made by a codefendant or other person implicating both himself and the accused, is not within [the statement against interest hearsay] exception."

struction when ... the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Id.* at 211. The Court added: "We express no opinion on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun." *Id.* at 211 n. 5.

[¶ 14] On two recent occasions, we have embraced the "facial implication doctrine," which holds that a redacted confession that replaces the names of defendants with neutral pronouns is admissible in evidence, provided that the statement standing alone does not otherwise connect the codefendants to the crimes. *See State v. Craney,* 662 A.2d 899, 903 (Me.1995); *State v. Platt,* 1997 ME 229, ¶ 6, 704 A.2d 370, 372.

[¶ 15] The latest development in this line of cases is the Supreme Court's recent decision of *Gray v. Maryland,* — U.S. —, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998), in which a police detective read a codefendant's confession regarding an assault into evidence and said the word "deleted" or "deletion" whenever Gray's name or a third defendant's name appeared. *Id.* at 1153. The prosecution also offered in evidence a written copy of the confession with the two names omitted, leaving in their place blank white spaces separated by commas. *Id.* Other witnesses testified to Gray's involvement in the assault, and the court instructed the jury that the confession should not be used as evidence against Gray. *Id.* The Supreme Court vacated Gray's conviction and answered the question left open in *Richardson* by holding that "considered as a class, redactions that replace a proper name with an obvious blank, the word 'delete,' a symbol, or similarly notify the jury that a name has been deleted are similar enough to *Bruton*'s unredacted confessions as to warrant the same legal results." *Id.* at 1156.

[¶ 16] We conclude that, just as the confessions admitted in *Gray,* the State's questioning of Theriault–Pace and O'Leary, which elicited the fact that four individuals were involved in the break-in and proceeded to name three of the participants, clearly notified the jury that a name was being deleted from Scott Boucher's confession. The State seeks to distinguish this case from *Gray* by pointing out that Steven's name was not replaced with a blank or the word "delete" in Scott's confessions, as was the defendant's name in *Gray.* This distinction does not persuade us that *Gray* is inapplicable. The teaching of *Gray* is that even redacted confessions can sometimes "obviously refer directly to someone, often obviously the defendant, and [can] involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." *Gray,* 118 S.Ct. at 1157. Scott's confessions, as admitted in evidence, obviously referred directly to Steven, an inference that the jury easily could have drawn simply from Steven's status as a codefendant. We conclude that the admission of those portions of Scott's confessions that implicated Steven violated Steven's rights under the Confrontation Clause of the Sixth Amendment.[5]

[¶ 17] The existence of a *Bruton* violation does not necessarily require reversal of an ensuing criminal conviction. *Schneble v. Florida,* 405 U.S. 427, 430, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). "In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error." *Id.*

[¶ 18] Because, however, Boucher failed to object to the admission of the redacted confession we apply the "obvious error[ ] affecting substantial rights" test. M.R. Evid. 103(d). Here we cannot say that "the obviousness of the error and the seriousness of the injustice done to" Steven was "so great" that we "cannot in good conscience let the conviction stand." *State v. True,* 438 A.2d 460, 469 (Me.1981).

---

**5.** Contrary to Steven's contentions, the testimony of Steven Michaud and Adam McBreairty did not implicate his Sixth Amendment rights under *Bruton* and *Gray.* These two witnesses' testimony regarding Scott's confessions did not address the actions of his colleagues or imply the involvement of others in any way.

[¶ 19]   Our reliance on *Gray v. Maryland,* a 1998 opinion of the United States Supreme Court, speaks to the lack of obviousness of the error.   Additionally, the ample "other evidence" supporting Steven's conviction eliminates any concern regarding serious injustice caused by the admission.

[¶ 20]   Steven's own confession of his involvement in the crimes was properly admitted through the testimony of Adam McBreairty.   McBreairty testified that Boucher gave him a gun taken from the Dubois house, and that Boucher told him that he filed the serial numbers off the gun because he was concerned that too many people knew of his involvement in the break-in. The gun was introduced in evidence and identified as the one stolen from the Dubois home.   Another participant in the break-in, Timothy Dumond, testified in compelling detail concerning Steven's involvement in the preparation for the crimes and in driving the car away from the house, and that Steven received a .38 caliber pistol taken from the house.   In light of McBreairty's and Dumond's testimony, the erroneously admitted evidence was merely cumulative, tending to corroborate other evidence properly before the jury.   *See Clark v. Maggio,* 737 F.2d 471 (5th Cir.1984) (evidence admitted in violation of defendant's Sixth Amendment confrontation right was not crucial to the State's case).

[¶ 21]   One of the concerns underlying *Bruton* is the inherent unreliability of the codefendant's confession and the absence of an opportunity to expose that unreliability through cross-examination.   *See Bruton,* 391 U.S. at 135–36.   In this case the erroneously admitted evidence was entirely consistent with the rest of the State's evidence.   This internal consistency must be considered in determining the significance of the prejudice to the defendant in comparison to the properly admitted evidence of guilt.   A review of the record in its entirety leads us to conclude that we can "in good conscience let the conviction stand."   *True,* 438 A.2d at 469.

The entry is:

Judgment affirmed.

