MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2017 ME 65
Docket:       Pen-15-389
Argued:       October 26, 2016
Decided:      April 6, 2017

Panel:        SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

STATE OF MAINE

v.

NICHOLAS SEXTON

HUMPHREY, J.

[¶1]   Nicholas Sexton appeals from a judgment of conviction of one count of murder, 17-A M.R.S. § 201(1)(A) (2016), and one count of arson (Class A), 17-A M.R.S. § 802(1)(A) (2016), following a jury trial.  A jury also found Randall Daluz, Sexton's co-defendant, guilty of three counts of murder and one count of arson.[1]

[¶2]   Sexton contends that the trial court (Penobscot County, *Anderson, J.*) erred when it instructed the jury on the defense of duress only for the arson charge and not for the murder charges; erred when it denied his motion for relief from prejudicial joinder with Daluz; abused its discretion and violated his right to due process when it allowed a witness to testify about

---

[1] After the conviction, Daluz moved for a new trial, the court denied the motion, Daluz appealed, and we affirmed.  *See State v. Daluz*, 2016 ME 102, 143 A.3d 800.

guns she observed in a motel room during a meeting with Sexton and Daluz; erred when it denied his motion to suppress cell phone records used to locate Sexton; and erred when it allowed testimony that insinuated Sexton "harmed people over drug debts."

[¶3]  We disagree and affirm the judgment.

## I.  BACKGROUND

[¶4]  Viewing the evidence in the light most favorable to the verdict, a fact-finder could have rationally found the following facts.[2]  *See State v. Reed*, 2013 ME 5, ¶ 9, 58 A.3d 1130.

[¶5]  On August 11, 2012, Sexton renewed a rental agreement for a white 2001 Pontiac Grand Prix.  At around 3:30 a.m. on August 13, 2012, that same vehicle was discovered burning in a Bangor industrial park.  Inside the vehicle were the bodies of three murdered individuals, later identified as Daniel Borders, Nicolle Lugdon, and Lucas Tuscano, who were last seen on the night of August 12, 2012, leaving an apartment on Bolling Drive in Bangor with Sexton.

[¶6]  On August 14, 2012, the day after the Pontiac was discovered, police requested and obtained, pursuant to the Stored Communications Act

---

[2]  Because we detailed the facts developed at the joint trial of Sexton and Daluz at length in our decision in *Daluz*, 2016 ME 102, 143 A.3d 800, we repeat here only the background necessary to address the issues raised in this appeal.

(SCA), 18 U.S.C.S. § 2702(c)(4) (LEXIS through Pub. L. No. 115-9),[3] cell phone location information in order to determine Sexton's whereabouts. That same day, police investigators used the location information obtained from a cell phone belonging to Sexton's girlfriend to locate Sexton at a hotel in Danvers, Massachusetts, where Sexton and his girlfriend stayed after they left Bangor together on August 13, 2012. Sexton declined to be interviewed by police investigators at that time.

[¶7] On September 26, 2012, Sexton was charged by indictment with three counts of murder, 17-A M.R.S. § 201(1)(A), and one count of arson (Class A), 17-A M.R.S. § 802(1)(A). Sexton pleaded not guilty to all counts.

[¶8] On September 27, 2012, the State filed a notice of joinder indicating that Sexton and Daluz would be tried together. U.C.D.R.P.–Bangor 8(b); M.R. Crim. P. 8(b) (Tower 2014).[4] Sexton moved for relief from joinder in July 2013 because Daluz gave statements to the police that implicated

---

[3] The Stored Communications Act (SCA), 18 U.S.C.S. § 2702(c)(4) (LEXIS through Pub. L. No. 115-9) permits wireless providers to disclose location data "to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency." Law enforcement officers made the SCA request, but did not obtain a warrant or seek judicial approval. Neither is required for requests pursuant to section 2702(c)(4).

The SCA request occurred prior to the Legislature's enactment, in 2013, of 16 M.R.S. § 648 (2016), which prohibits a government entity from obtaining "location information of an electronic device" without a warrant.

[4] Those proceedings occurred before the adoption and implementation of the Maine Rules of Unified Criminal Procedure (effective Jan. 1, 2015) in Penobscot County. M.R.U. Crim. P. 1(e)(1).

4

Sexton. The court (*Anderson, J.*) initially granted the motion because a joint trial would present a "*Bruton* problem," *see Bruton v. United States*, 391 U.S. 123 (1968), but indicated that it was "still considering whether to have two simultaneous trials with two juries." *See* M.R. Evid. 105; *see also State v. Boucher*, 1998 ME 209, ¶ 12, 718 A.2d 1092. Sexton then moved again for relief from prejudicial joinder, arguing against simultaneous trials. After the State moved to reconsider the court's decision to sever the trials and represented that Daluz's statements would not be introduced at trial, the court denied Sexton's motion for relief from prejudicial joinder, concluding that there was no longer a *Bruton* problem, and that Sexton did not demonstrate that joinder was sufficiently prejudicial to warrant severance. The court denied Sexton's motion to reconsider.

[¶9] Sexton filed a motion to suppress the cell phone location information that led police to locate and attempt to interview him on August 14, 2012. On April 1, 2014, the court denied the motion to suppress, concluding that the SCA request did not constitute a "search" implicating constitutional protections; that probable cause existed and there were exigent circumstances; that officers acted in good faith in making the SCA request; and

that police located Sexton using Sexton's girlfriend's cell phone location information and Sexton had no expectation of privacy in her records.

[¶10]  The joint trial commenced on May 1, 2014.  Katelyn Lugdon, sister of victim Nicolle Lugdon, testified that she and Borders met with Sexton and Daluz in a motel room on the night of August 11, 2012.  During the meeting, Katelyn saw two firearms on the bed, one silver with a rounded barrel and the other darker and smaller with two holes.  She observed Sexton place the silver gun under his shirt, while Daluz played with the other gun.  Katelyn testified that during a prior interview with police, she described the guns and then was shown photographs of a derringer and a Jimenez .380 caliber handgun that had been recovered from the Penobscot River.  She testified about the interview and photos, but was not shown the guns or photos of the guns at trial.[5]

[¶11]  Sexton attempted to ask Katelyn questions that would potentially lead to the admission of Daluz's statements to a fellow inmate at the Penobscot County Jail that Daluz shot Nicolle Lugdon to gain Sexton's trust.  The court ruled that the question was improper and stated that an objection would be sustained, prompting Sexton to move to sever the cases in order to

---

[5]  Both State's Exhibit 73, the photo of the derringer, and Exhibit 74, the photo of a Jimenez .380 caliber handgun, were marked but not admitted.  The jury was shown the guns at trial.

6

use the statement to establish who possessed the guns. The court denied the motion to sever. A second attempt was made to introduce Daluz's statement to the inmate during Sexton's testimony; the court reiterated that an objection to such a question would be sustained.

[¶12] The State rested on May 16, 2014. Sexton took the stand on May 19 and called no other witnesses.

[¶13] Sexton testified that after leaving the Bolling Drive apartment on the night of August 12, 2012, he, Daluz, Borders, Tuscano, and Lugdon rode in the white Pontiac Grand Prix to smoke marijuana. Sexton drove and Borders sat in the front passenger seat. The others sat in the rear with Daluz on the passenger side, Lugdon in the middle, and Tuscano on the driver side. Borders made a comment, prompting Daluz to "smack[] him in the head" with the Jimenez .380 caliber handgun several times. "Then all of a sudden the gun" fired, shooting Borders in the head and "everybody just start[ed] panicking." Tuscano "was flipping out on Daluz" and then Daluz shot Tuscano. While Lugdon was screaming, yelling, and crying, Daluz collected their cell phones and instructed Sexton to keep driving.

[¶14] Sexton testified that because the car was running out of gas and Daluz wanted to avoid gas stations, they drove to a friend's house in Dedham

and took a gas can of fuel. Daluz instructed Sexton to put some in the car and save some to burn the car. They drove to a remote area in Hermon, where Daluz forced Lugdon to eat pills. Daluz then shot Lugdon. Sexton testified that Daluz then told him not to say anything, or else Daluz would shoot him and his family.[6] When Sexton dropped Daluz off at the hotel, Daluz ordered him at gunpoint to burn the car and threatened to shoot him and burn him in the car if he did not. Sexton agreed, drove to the industrial park, and set the car on fire.

[¶15] Daluz called three witnesses and elected not to testify. The parties made closing arguments on May 20, 2014. The court submitted the case to the jury and deliberations began on May 21.

[¶16] During deliberations, the jury asked for clarification of the instructions several times, particularly focusing on the defense of duress. The first duress-related question asked: "Are we being asked to consider that Nick Sexton was under duress during the murders? We have been asked to consider duress for arson." Sexton did not ask the court to instruct the jury to consider duress for the murder charges, electing instead to remain consistent with his closing argument and his original request to instruct the jury on

---

[6] The sequence of Daluz shooting Lugdon and Daluz threatening Sexton and his family was described differently in our decision in *Daluz*, 2016 ME 102, ¶ 25, 143 A.3d 800. Although the events were germane to our decision in *Daluz*, the sequence of the events was not.

duress only as to the arson charge. The court answered: "No, [duress] does not play a part in—it is not being posed as a defense in that situation." The second juror note asked: "[D]id you say we cannot use duress as a defense for murder[?] Question two, if yes, why is this missing in the instructions[?] And three, can duress be used to find a defendant not guilty of murder if the defense has not requested it [?]" The court answered that duress could not be considered as a defense to murder.

[¶17] On May 28, 2014, the jury reported that it was deadlocked and unable to reach a unanimous verdict on the counts charging Sexton with the murders of Borders and Tuscano. With the parties' agreement, the court declared a mistrial as to those counts. The jury returned a verdict of guilty on the count charging Sexton with Lugdon's murder and the arson count.

[¶18] On July 28, 2015, the court sentenced Sexton to seventy years of imprisonment for the single murder conviction and twenty years for the arson conviction, to be served consecutively to the sentence for the murder conviction. Sexton filed a timely notice of appeal and also filed an application for leave to appeal his sentence, which was denied. *See State v. Sexton*, No. SRP-15-390 (Me. Sent. Rev. Panel Sept. 29, 2015); 15 M.R.S. § 2151 (2016); M.R. App. P. 20. This appeal followed.

## II.  DISCUSSION

A.     The Duress Jury Instruction

[¶19]  Sexton first argues that the court erred in failing to instruct the jury to consider duress as a defense to the murder counts.[7]  We interpret the applicable statutes de novo.  *See State v. Gantnier*, 2012 ME 123, ¶ 9, 55 A.3d 404.

> It is a defense that, when a person engages in conduct that would otherwise constitute a crime, the person is compelled to do so by threat of imminent death or serious bodily injury to that person or another person or because that person was compelled to do so by force.

17-A M.R.S. § 103-A(1) (2016).[8]  A duress instruction is warranted only if the evidence generates the defense.  *State v. Gagnier*, 2015 ME 115, ¶ 13, 123 A.3d 207.  To determine whether the defense is generated, we review the record in the light most favorable to the defendant "to determine if it would have

---

[7]  Sexton also argues that the court's instruction on the definition of "imminent" constituted error.  We disagree and do not discuss this further.  *See State v. Larrivee*, 479 A.2d 347, 350-51 (Me. 1984).

[8]  Although Sexton was charged with intentional and knowing murder, 17-A M.R.S. § 201 (2016), and duress is not an available defense "[t]o a person who intentionally or knowingly committed the homicide for which the person is being tried," 17-A M.R.S. § 103-A(3)(A) (2016), the court instructed the jury on accomplice liability.  *See* 17-A M.R.S. § 57 (2016).  Because we conclude that the evidence was insufficient to generate the defense, and therefore the court did not err in refusing to give the instruction, we need not reach the question of whether duress is an available defense to accomplice liability murder.

allowed the jury to find facts to make duress a 'reasonable hypothesis.'" *Id.* (quoting *State v. Doyon*, 1999 ME 185, ¶ 7, 745 A.2d 365).

[¶20] According to Sexton's testimony, Daluz threatened him *after* Borders, Tuscano, and Lugdon had already been shot. Even viewed in the light most favorable to Sexton, without a threat of imminent harm that preceded the murders, there was no evidence from which the jury could form a "reasonable hypothesis" that Sexton was under duress when the murders occurred. *Gagnier*, 2015 ME 115, ¶ 13, 123 A.3d 207 (quotation marks omitted); *see also State v. Tomah*, 1999 ME 109, ¶ 20, 736 A.2d 1047 (absence of evidence defendant was compelled to commit criminal act failed to generate duress defense).

[¶21] We conclude that the evidence was insufficient to generate the defense of duress as to the murder charges and that the court therefore did not err in refusing to give the instruction.[9]

B. Motion for Relief from Prejudicial Joinder

[¶22] Sexton argues that the court erred in denying his motion for relief from prejudicial joinder. *See* U.C.D.R.P.–Bangor 8(d); M.R. Crim. P. 8(d) (Tower 2014) (authorizing the court to "grant a severance of defendants or

---

[9] Because we conclude the evidence was insufficient to generate the instruction, we do not address the parties' other arguments, including that Sexton waived the instruction by affirmatively requesting that the court not give it.

provide whatever other relief justice requires, including ordering multiple simultaneous trials" if the defendant appears prejudiced by joinder with a co-defendant). The denial of a motion to sever joinder of two defendants is reviewed for an abuse of discretion. *State v. Chesnel*, 1999 ME 120, ¶ 13, 734 A.2d 1131.

[¶23] Sexton argues that joinder with Daluz prejudiced him in three ways: first, he was unable to introduce Daluz's out-of-court statements in which Daluz purportedly confessed to Lugdon's murder; second, Sexton's trial strategy was compromised, particularly in electing whether to present alternative suspects because he did not know if Daluz would testify; and lastly, he and Daluz had mutually antagonistic defenses such that they risked accusing each other of the offenses, acting as a second prosecutor, and increasing the prospects of a conviction of one or both of them.

[¶24] While incarcerated in the county jail, Daluz allegedly told a fellow inmate that he shot Lugdon to gain Sexton's trust. Sexton's contention that his inability to introduce Daluz's confession prejudiced him lacks merit because the statements were, at least as presented, inadmissible: both witnesses through whom Sexton attempted to introduce the statements lacked personal knowledge. *See* M.R. Evid. 602, 801, 802. The individual who could have

testified from personal knowledge—the cellmate—was never called. Because Sexton makes no argument as to why the statements would have been admissible in a separate trial, there was no prejudice.

[¶25] Sexton's remaining arguments that joinder hampered his trial strategy and he was prejudiced by mutually antagonistic defenses are unavailing. "[I]t is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Zafiro v. United States*, 506 U.S. 534, 540 (1993) (noting that the joined defendants failed to allege any specific instances of prejudice and concluding that such a general challenge was insufficient to warrant separate trials). We have repeatedly rejected contentions that mutually antagonistic defenses necessarily require separate trials. *See, e.g.*, *State v. George*, 2012 ME 64, ¶ 25, 52 A.3d 903 ("Mutually antagonistic defenses are not prejudicial *per se*." (quotation marks omitted)); *State v. Lakin*, 2006 ME 64, ¶¶ 12-13, 899 A.2d 777 (affirming the denial of a motion to sever where co-defendants accused one another and the court gave a proper jury instruction); *Chesnel*, 1999 ME 120, ¶ 12, 734 A.2d 1131 (concluding that the trial court properly instructed the jury to independently weigh evidence and did not abuse its discretion in denying a motion to sever where the co-defendants implicated each other).

[¶26]  Sexton essentially argues that joinder was prejudicial per se because of his and Daluz's incompatible and irreconcilable defenses—a contention that, without more, is not persuasive.  *See, e.g.*, *George*, 2012 ME 64, ¶ 25, 52 A.3d 903.  The trial court carefully instructed the jury to independently weigh the evidence against each defendant, *Zafiro*, 506 U.S. at 541, and did not abuse its discretion in denying the motion for relief from prejudicial joinder.

C.    Witness Testimony About Guns

[¶27]  Sexton argues that Katelyn Lugdon's testimony about the guns amounted to an identification and that the police interview was improperly suggestive.  He argues that admitting the evidence contravened due process and was an abuse of discretion pursuant to Maine Rules of Evidence 401 and 403.

[¶28]  Assuming the testimony did constitute an identification,[10] we join the overwhelming majority of courts that have concluded due process identification procedures do not apply to inanimate objects.  *See, e.g.*, *Inge v.*

---

[10]  Sexton does not point to Katelyn Lugdon's "identification" of the guns recovered along the Penobscot as the guns she saw during the meeting at the motel on August 11 because she did not make such an identification at trial.  Rather, Sexton appears to argue Katelyn's description, which arguably describes similar guns, "amounts to an identification of the guns" and that description was tainted by the police questioning because she never mentioned guns in her earlier interviews.  As we discuss below, this was a proper subject for impeachment on cross examination and did not render the descriptions inadmissible.

*Procunier*, 758 F.2d 1010, 1015 (4th Cir. 1985); *State v. Roscoe*, 700 P.2d 1312, 1324 (Ariz. 1984); *Dee v. State*, 545 S.E.2d 902, 903 (Ga. 2001) ("By the great weight of authority, the right to pretrial identification procedures is inapplicable to items of physical evidence." (quotation marks omitted)); *Brooks v. State*, 560 N.E.2d 49, 57 (Ind. 1990) ("The viewing of items of physical evidence is not subject to the same due process considerations which attend a corporeal lineup."); *People v. Miller*, 535 N.W.2d 518, 523 (Mich. Ct. App. 1995) ("The risks inherent in a misidentification of inanimate objects produced in the thousands are not the same as the risks of misidentification of unique human beings."); *Hughes v. State*, 735 So. 2d 238, 260-61 (Miss. 1999) (truck identification); *State v. Cyr*, 453 A.2d 1315, 1317 (N.H. 1982) (declining to require lineup for identification of a car); *State v. Delgado*, 902 A.2d 888, 898-99 (N.J. 2006) (refusing to extend due process protection to minivan identification). A minority of jurisdictions, including Massachusetts, have, however, entertained due process challenges to such identifications. *See Commonwealth v. Simmons*, 417 N.E.2d 1193, 1196 (Mass. 1981) ("[I]n an extreme case, the degree of suggestiveness of an identification procedure concerning an inanimate object might rise to the level of a denial of due

process."); *see also Commonwealth v. Bresilla*, 23 N.E.3d 75, 82 (Mass. 2015) (concluding jacket identification procedure did not contravene due process).

[¶29]  Even if we were to apply due process principles to identification of inanimate objects, Sexton's argument would still fail because the identification here was not unduly suggestive.  Katelyn described the guns *before* she was shown the photographs by police and her later description was not inconsistent.  Sexton points to no inconsistency between the description that she provided in the interview and the description at trial, but appears to argue that because police showed her only two photographs during the interview, this procedure violated due process.  We discern no due process violation.  *See Bresilla*, 23 N.E.3d at 83 (holding that police were not required to create lineup of jackets; using a single photograph of a jacket did not violate due process).

[¶30]  Sexton next argues that the court should have excluded Katelyn's testimony pursuant to Maine Rules of Evidence 401 and 403, citing Katelyn's lack of familiarity with guns, vague description, the passage of time, and her relationship to the parties.  We review the admissibility of the testimony and the trial court's weighing of probative value against prejudicial effect for an abuse of discretion.  *See State v. Crocker*, 435 A.2d 58, 73 (Me. 1981).

[¶31] Katelyn's description of the guns was clearly relevant as a fact probative of whether Sexton possessed a gun and had an opportunity to commit the murders. *See* M.R. Evid. 401. The question is whether the "probative value is substantially outweighed by a danger of . . . unfair prejudice." M.R. Evid. 403. Although weapon evidence can have a prejudicial effect, this does not necessarily rise to unfair prejudice, particularly when the evidence is highly probative. *See State v. Forbes*, 445 A.2d 8, 12-13 (Me. 1982) (characterizing "unfair prejudice" as having a "tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one" (quotation marks omitted)). There was a two-year gap between the time when Katelyn saw the guns at the motel and the time police interviewed her, but this was not so remote as to render the description inadmissible. *See State v. Warren*, 312 A.2d 535, 544 (Me. 1973) (characterizing remoteness as an element that "bears primarily on weight and not on basic admissibility"). Sexton's other objections to Katelyn's knowledge and reliability go to the weight of her testimony rather than admissibility and were a proper subject for cross-examination. In fact, the defense explored the subject numerous times.

[¶32]   The court did not abuse its discretion in permitting Katelyn Lugdon to testify about the guns.

D.     Motion to Suppress Cell Phone Records

[¶33]   Sexton next argues that the court erred in denying his motion to suppress cell phone records that he claims were obtained by the investigators and used to establish his location on August 14, 2012.  On appeal, we review factual findings for clear error and legal conclusions de novo and "[w]e will uphold the court's denial of a motion to suppress if any reasonable view of the evidence supports the trial court's decision."  *State v. Babb*, 2014 ME 129, ¶ 9, 104 A.3d 878 (quotation marks omitted).

[¶34]   The motion was limited to suppressing the cell phone location information that enabled police to locate and attempt to interview Sexton on August 14, 2012.   Assuming, without deciding, that the SCA request constituted a "search" for constitutional purposes, Sexton does not challenge the factual finding that law enforcement relied solely on Sexton's girlfriend's records, not Sexton's records, to locate him and that he had no expectation of privacy in her records.  The court therefore correctly concluded that Sexton lacked standing.  *See State v. Lovett*, 2015 ME 7, ¶ 8, 109 A.3d 1135 (holding

18

that a defendant must establish a reasonable expectation of privacy to have standing to assert a Fourth Amendment violation).

[¶35] The trial court did not err in denying the motion to suppress.

E.    Prior Bad Acts Testimony

[¶36] Finally, Sexton argues that the court erred in allowing testimony that insinuated he "harm[ed] people over drug debts"—an inadmissible prior bad act. *See* M.R. Evid. 404(b). Sexton failed to object at trial and therefore the issue is reviewed for obvious error. *See State v. Pabon*, 2011 ME 100, ¶ 18, 28 A.3d 1147. "To demonstrate obvious error, the defendant must show that there is (1) an error, (2) that is plain, and (3) that affects substantial rights." *State v. Dolloff*, 2012 ME 130, ¶ 35, 58 A.3d 1032 (quotation marks omitted). "Even if these three conditions are met, we will set aside a jury's verdict only if we conclude that (4) the error seriously affects the fairness and integrity or public reputation of judicial proceedings." *Id.* (quotation marks omitted).

[¶37] On cross-examination, Sexton asked a witness who associated with Sexton and Daluz and sold drugs, "In your line of work back then [drug trafficking], what were the occupational hazards?" The witness responded "getting arrested." The State on redirect revisited the subject of "occupational hazards":

> Q: What are some of the occupational hazards that you have observed with some of the people you know to sell drugs?
> A: I mean, some people if you don't pay them or whatever, they'll get rough with you, but didn't really—that never was the case really.
> Q: Well, you have had friends that that's happened to, haven't you?
> A: Yeah.
> Q: And you are aware that some of those people are connected to Mr. Sexton?
> A: Yeah I was told about the events, yeah.

During a bench conference, the court observed:

> Concerning the liabilities of dealing in drugs question . . . then there was a question about Mr. Sexton. I'm not sure I understood everything, but it almost appeared that there was a comment that Mr. Sexton had harmed somebody in the past.

[¶38] Taken in isolation, the questioning could generate an inference that Sexton had been "rough" with customers, which could be inadmissible as a prior bad act to suggest Sexton acted in conformity and committed the charged offenses. Yet when highlighted by the court at sidebar, the State, Sexton, and Daluz all agreed that they did not interpret the questioning to suggest that Sexton had in fact hurt someone in the past over drug debts. The court raised the issue, but Sexton declined to request that the court give a curative instruction or strike the testimony. *Cf. Dolloff*, 2012 ME 130, ¶ 36, 58 A.3d 1032 (stating that a defendant establishes error where the matter went "unaddressed by the court").

[¶39] Even if construed as evidence of a prior bad act, the testimony was probative of motive and therefore admissible for that purpose: the State's line of questioning explored Sexton's behavior on the night of August 12 and his relationship with Borders. *See State v. Heald*, 393 A.2d 537, 542 (Me. 1978) (holding prior bad act admissible to prove motive). Viewing the questioning within the context of the testimony and the trial as a whole, there was no obvious error. *See Dolloff*, 2012 ME 130, ¶ 44, 58 A.3d 1032.

The entry is:

Judgment affirmed.

---

Jeremy Pratt, Esq. (orally), and Ellen Simmons, Esq., Camden, for appellant Nicholas Sexton

Janet T. Mills, Attorney General, and Leanne Robbin, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Penobscot County Unified Criminal Docket docket number CR-2012-3777
FOR CLERK REFERENCE ONLY