MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2021 ME 47
Docket:      Pen-20-231
Argued:      July 14, 2021
Decided:     September 28, 2021

Panel:       MEAD, GORMAN, JABAR, HUMPHREY, HORTON, and CONNORS, JJ.

## STATE OF MAINE

v.

## CHRISTOPHER MURRAY

JABAR, J.

[¶1]   Christopher Murray appeals from a judgment of conviction of intentional or knowing murder, 17-A M.R.S. § 201(1)(A) (2021); elevated aggravated assault (Class A), 17-A M.R.S. § 208-B(1)(A) (2021); and robbery (Class A), 17-A M.R.S. § 651(1)(E) (2021); entered in the trial court (Penobscot County, *Anderson, J.*) following a jury trial.  Murray contends that the court erred in refusing to instruct the jury on the defense of duress.  He also contends that the court abused its discretion by precluding his expert witness from expressing an opinion that it was "more likely than not" that the surviving victim was "confabulating" her memory when recalling what happened during

2

the shootings that resulted in the criminal charges.[1]  We affirm the judgment and sentence.

## I. BACKGROUND

[¶2]  Viewing the evidence in the light most favorable to the jury's verdict, the trial record supports the following facts.  *See State v. Patton*, 2012 ME 101, ¶ 2, 50 A.3d 544.

[¶3]  In December 2017, Murray was dating a woman named Alexis Locklear, whom he lived with in North Carolina.  Tony Locklear, Alexis's father, lived and worked in Maine before moving in with Alexis and Murray in November 2017.  Shortly after moving in with the couple, Tony asked Alexis to drive him to Maine so that he could retrieve money he supposedly hid in his home in East Millinocket.  Murray joined Tony and Alexis for the trip.  Shortly after the three arrived in East Millinocket on December 19, 2017, Tony called Wayne LaPierre to arrange to buy marijuana from him.

[¶4]  Wayne and Diem LaPierre owned a house in Millinocket.  They had several business ventures, including as caregivers under Maine's medical

---

[1]  Murray also contends that the sentencing court's imposition of a life sentence upon him violated his Sixth Amendment right to a jury determination of whether a *Shortsleeves* factor was present.  *See State v. Hutchinson*, 2009 ME 44, ¶¶ 32-38, 969 A.2d 923; *State v. Shortsleeves*, 580 A.2d 145, 149-50 (Me. 1990) (establishing a nonexhaustive list of factors that would justify the imposition of life imprisonment).  We do not find this argument persuasive and do not discuss it further.

marijuana program. Wayne and Diem previously hired Tony to help with home renovations, and Tony sometimes bought marijuana from Wayne. Neither Wayne nor Diem knew Murray or Alexis.

[¶5] Tony arrived at Wayne's house at about 6:30 p.m. with Murray and Alexis. Upon arrival, while all three were still in the car, Alexis observed Tony pull a gun out of his pocket and give Murray a second gun, which Murray put in his front coat pocket.

[¶6] After going inside the home, according to Diem, the three guests began "acting very weirdly." Tony asked Wayne about the marijuana, and Wayne went to the basement of the house and came back with two buckets of marijuana. Around this time, Murray asked Wayne whether the house was equipped with a working video surveillance system; Wayne replied that it was not. Tony then yelled "now," and both he and Murray produced guns. Murray pointed his gun at Wayne, made him lie on his stomach, and handcuffed his hands behind his back. Tony bound Diem's hands behind her back with rope, took rings off her fingers, and demanded money. Diem responded that her wallet was in her car in the driveway, at which point Tony ordered Alexis to go out and get the wallet. After Alexis brought the wallet inside, Tony ordered her to take the buckets of marijuana out to their car. As she was getting the second

bucket, Alexis heard Tony tell Diem that Tony and Murray were going to have to shoot Diem and Wayne.  When Wayne asked why, Tony replied that it was because Diem and Wayne were greedy.  After that, Alexis went outside and remained there.

[¶7]  Tony and Murray took Diem and Wayne to Wayne's bedroom, which was in the basement of the house, and made them sit against the wall.  Tony and Murray traded guns so that Murray had the larger gun.  Murray placed a pillow over Diem's head and shot her once.  Diem fell onto Wayne.  She then heard "them" shoot Wayne twice.  Diem pretended to die, but "they" came back and shot Diem a second time in the head and she lost consciousness.  After regaining consciousness, Diem untied the rope binding her hands and crawled upstairs, where she called 9-1-1.

[¶8]  When the police arrived, Wayne was alive but had apparent gunshot wounds to the head.  Wayne and Diem were transported to the hospital.  Four days later, Wayne died in the hospital due to the gunshot wounds.  Diem had two gunshot wounds to her head.  One of the wounds caused traumatic injury to the left parietal region of her brain.  The other wound led to Diem's left eye being surgically removed.  Two bullet fragments remain in Diem's head.

[¶9] On December 20, 2017, when interviewed at the hospital by a Maine State Police detective, Diem told the detective that Tony and two other people, whom she later identified as Alexis and Murray, came to her house. Diem told the detective that Murray shot her and Wayne. Murray, Tony, and Alexis were apprehended in North Carolina and extradited to Maine.

## II. PROCEDURAL HISTORY

[¶10] On December 26, 2017, Murray was charged by complaint with intentional or knowing murder, in violation of 17-A M.R.S. § 201(1)(A), and of elevated aggravated assault, in violation of 17-A M.R.S. § 208-B(1)(A). The Penobscot County grand jury indicted Murray on both counts, as well as one count of robbery, in violation of 17-A M.R.S. § 651(1)(E). On April 3, 2018, Murray pleaded not guilty to all charges at his arraignment.[2] The court held a five-day jury trial from January 28 to February 1, 2019.

[¶11] Prior to trial, the State filed a motion in limine to exclude all testimony from a psychological expert Murray planned to call to discuss the

---

[2] On March 5, 2018, the State filed a notice of joinder of the indictments pending against Tony, who was charged with murder, elevated aggravated assault, and robbery; and Alexis, who was charged with felony murder. *See* M.R.U. Crim. P. 8(b). Before Murray's trial, Tony pleaded guilty to each of the three charges against him, and Alexis entered into a plea agreement with the State whereby she agreed to testify at Murray's trial. In exchange, the State agreed to dismiss the felony murder charge. On March 13, 2019, the trial court (*Anderson, J.*) sentenced Tony to life imprisonment on the murder charge and concurrent thirty-year terms of imprisonment on the other charges.

6

concept of "confabulation" in relation to Diem's testimony.[3]  The court denied

the motion and allowed all of the expert's testimony except for his conclusion

that Diem was likely confabulating.  During a voir dire examination at trial, as a

proffer from Murray, the expert did testify that it was "more likely than not"

that Diem's recollection of the shooting was a product of confabulation.  Upon

the State's objection to the expert's entire testimony, the court excluded only

this opinion from being presented in front of the jury.  The court stated that it

excluded this statement because (1) it related to witness credibility; (2) the

court was troubled by the expert's conclusion that it was "more likely than not"

that Diem was confabulating despite his admission that "most clinical

neuropsychologists . . . wouldn't be necessarily talking about confabulation";

and (3) the expert would be acting as a thirteenth juror, employing the same

type of analyses that the jurors would be using as fact finders.

[¶12]  In front of the jury, Murray's expert testified that inconsistencies

between Diem's testimony and her statements to the 9-1-1 operator indicate

that Diem might have gaps in her memory of the incident.  The expert also

testified that people who have suffered traumatic brain injury can assimilate

---

[3]  The expert described "confabulation" as "unintentional remembering," a sort of "filling in of blanks" with information from sources other than genuine memories, often after lapses in genuine memory due to causes such as traumatic brain injury.

information reported to them by others, sometimes even doing so subconsciously, such that they are themselves unaware that their "recollections" are not based on their own perceptions.

[¶13]  At the end of the trial, Murray asked for a jury instruction on the defense of duress.  He argued that the defense of duress applies to accomplice murder and to the other offenses on which he was tried.[4]

[¶14]  Murray based his duress argument on inconsistencies between an interview Alexis gave to Maine State Police eight days after the shooting in December 2017 and her testimony at trial.  During the interview, which was entered into evidence and summarized by the State at trial, Alexis told police that Tony "told [Murray] that he had to go in there with him," gave him a gun, and said Murray "had to do it."  Alexis then said to police that Tony told her that she would not be able to marry Murray "because he wasn't going to walk out of there alive" if he did not help Tony.

[¶15]  At trial, however, after the State offered Alexis a plea deal, Alexis testified that, because she wanted to prevent Murray from getting in trouble, she lied to police during the December 2017 interview when she said her father threatened Murray into participating.  Despite her testimony at trial, Murray

---

[4]  The jury was instructed on two forms of accomplice liability, both primary and secondary.

8

argued that Alexis's December 2017 statements showed that Murray was threatened into committing the crime by Tony.

[¶16]  The court denied the jury instruction and determined that the evidence did not generate the defense of duress because, while duress might have been generated as to Alexis herself, "there's really no evidence, in [the court's] opinion, that would show that Mr. Murray was participating in something because he was being threatened to do so by [Tony]."  Murray did not testify at trial.

[¶17]  On February 1, 2019, the jury returned its verdict, convicting Murray of intentional murder, elevated aggravated assault, and robbery.[5]

[¶18]  On July 31, 2020, the court (*Anderson, J.*) imposed a term of life imprisonment on the murder charge and concurrent thirty-year terms of imprisonment on the charges of elevated aggravated assault and robbery.  The court explained that it was imposing a life sentence because it found three *Shortsleeves* factors present: premeditation, commission of a homicide during the course of another crime, and unusual cruelty.  On August 21, 2020, Murray

---

[5]  After the jurors were polled, Murray asked that the jury render a "special verdict . . . to tell us whether [Murray] was a principal or accomplice" because he believed that it would "impact sentencing tremendously."  The State objected, and the court denied the request.  It is unclear whether the jury convicted Murray for "intentionally or knowingly" committing the homicide, which would bar the availability of a duress defense, *see* 17-A M.R.S. § 103-A(3)(A) (2021), or whether the jury convicted him as an accomplice, which Murray argues would allow a duress instruction.

filed a notice of appeal from the conviction pursuant to M.R. App. P. 2(b)(1) and 15 M.R.S. § 2115 (2021) and an application to appeal his sentence pursuant to M.R. App. P. 20 and 15 M.R.S. § 2151 (2021). The Sentence Review Panel issued an order granting the application for leave to appeal the sentence. *State v. Murray*, No. SRP-20-232 (Me. Sent. Rev. Panel Oct. 27, 2020).

### III. DISCUSSION

#### A. Jury Instruction on Duress

[¶19] Murray contends that the trial court erred by denying his request for a jury instruction on duress as it relates to accomplice liability. In reviewing the trial court's determination of whether a statutory defense was generated, "we view the facts . . . in the light most favorable to the defendant, review any factual findings for clear error, and conduct a de novo review of the trial court's decisions of law." *State v. Fletcher*, 2015 ME 114, ¶ 12, 122 A.3d 966 (quotation marks omitted). "Because of this statutory framework, when the evidence generates the issue of duress, a court commits error by denying a request to instruct the jury on that defense." *State v. Gagnier*, 2015 ME 115, ¶ 13, 123 A.3d 207. Vacatur is appropriate when that error is prejudicial. *State v. Hanscom*, 2016 ME 184, ¶¶ 10, 14, 152 A.3d 632.

[¶20] The Legislature has defined the defense of duress as follows:

**1.** It is a defense that, when a person engages in conduct that would otherwise constitute a crime, the person is compelled to do so by threat of imminent death or serious bodily injury to that person or another person or because that person was compelled to do so by force.

**2**. For purposes of this section, compulsion exists only if the force, threat or circumstances are such as would have prevented a reasonable person in the defendant's situation from resisting the pressure.

**3.** The defense set forth in this section is not available:

**A.** To a person who intentionally or knowingly committed the homicide for which the person is being tried

. . . .

17-A M.R.S. § 103-A (2021). We have made it clear that the harm "must be real and specific, and the specific harm that is feared must be imminent." *Gagnier,* 2015 ME 115, ¶ 16, 123 A.3d 207 (quotation marks omitted). We have further stated that "the threatened harm is not 'imminent' when the threatened person has 'the opportunity to escape that [threatened] harm' or 'to seek help or to report [the] threat to the authorities.'" *Id.* (alterations in original) (quoting *State v. Larrivee,* 479 A.2d 347, 351 (Me. 1984)). "Further, the effect of the threat must be viewed objectively, such that under section 103-A(2), it would have prevented a reasonable person in the defendant's situation from resisting the pressure arising from the threat." *Id.* (quotation marks omitted).

[¶21] Although the statute expressly prohibits application of the defense of duress for a defendant charged with intentional or knowing murder, *see* 17-A M.R.S. § 103-A(3)(A), we have never stated whether it is available to a person charged with murder when the jury is instructed on accomplice liability. *See State v. Sexton*, 2017 ME 65, ¶ 19 n.8, 159 A.3d 335 ("Because we conclude that the evidence was insufficient to generate the defense, and therefore the court did not err in refusing to give the instruction, we need not reach the question of whether duress is an available defense to accomplice liability murder.").

[¶22] While Murray makes an extensive argument for why duress should be applicable to murder cases when the jury is instructed on accomplice liability, it is not necessary for us to reach the question in this case. At no point did Alexis testify that Tony threatened to kill or seriously injure Murray if he did not shoot the LaPierres. Rather, Alexis told the police in the December 2017 interview that Tony said that if Murray did not go into the LaPierres' house then she would not be able to marry Murray because she could not "marry a dead man." However, when asked pointedly at trial whether Tony told Murray that he had to kill the LaPierres, Alexis replied, "No." There was no evidence at trial

that Tony ever made a threat directly to Murray or that Murray overheard any statements Tony made to Alexis.

[¶23] The evidence, viewed in the light most favorable to Murray, is that Alexis was very scared of her father and that Tony told Murray to enter the LaPierres' house with him. However, there was no evidence that Murray was "compelled to [commit the crimes] by threat of imminent death or serious bodily injury" from Tony. 17-A M.R.S. § 103-A(1); *see also Larrivee*, 479 A.2d 347, 349-351 (Me. 1984) (holding that a threat from a dangerous and violent friend that the defendant would be "very sorry" if he did not commit robbery was insufficient to warrant a jury instruction on duress).

[¶24] The trial court did not err in determining that the evidence presented, viewed in the light most favorable to Murray, did not generate a duress instruction. "Given the absence of evidence of specific imminent harm or evidence of compulsion by force, the court properly declined to instruct the jury on the defense of duress." *State v. Carrillo*, 2021 ME 18, ¶ 37, 248 A.3d 193.

## B. Psychological Expert Testimony

[¶25] Murray next contends that the trial court abused its discretion when it precluded Murray's psychological expert from expressing an opinion that it was "more likely than not" that Diem was "confabulating" her memory

when recalling what happened during the shootings. The trial court excluded a portion of the expert witness's testimony in part because it related to witness credibility as well as an ultimate question of fact, which are matters for the jury to decide. We review a trial court's ruling on the admissibility of expert testimony for an abuse of discretion. *State v. Burbank*, 2019 ME 37, ¶ 7, 204 A.3d 851.

[¶26] With regard to witness credibility, the question in this case is whether the defendant's proffer met the legal standard for admitting expert testimony to impeach credibility. It did not. There exists a "settled rule of exclusion of psychological testimony tending to impeach credibility of specific witnesses." Field & Murray, *Maine Evidence* § 702.2 at 380 (6th ed. 2007). "[E]xpert testimony can be used to impeach a witness' credibility only where there is a medical condition, i.e., a disability of the mental or physical processes, that affects the ability of the witness to tell the truth." *State v. Hatt*, 2002 ME 166, ¶ 8, 810 A.2d 415 (alteration omitted) (quotation marks omitted). We have upheld the exclusion of expert testimony offered to impeach credibility when "the proffer [did] not include a sufficient description of either the traits of the disorder generally or of the witness' manifestations of the disorder in particular." *Id.* ¶ 9.

[¶27] Here, Diem suffered two gunshot wounds to the head that resulted in a traumatic brain injury. Expert testimony as to the impact of that injury on her ability to recollect accurately could potentially be admissible if the injury affected her ability to testify accurately. The expert's testimony, however, did not focus on Diem's specific brain injury nor did he offer an opinion based on scientific evaluations that the injury actually prevented accurate recollection. Rather, the expert based his conclusions about Diem on inconsistencies between her testimony and statements made to the 9-1-1 operator.[6]

[¶28] The trial court also excluded the expert's opinion statement because it related to an ultimate question of fact best left to the jury. M.R. Evid. 704 provides for the admissibility of testimony in the form of an opinion on an ultimate issue to be decided by the jury, but the trial court may exclude an expert's opinion under M.R. Evid. 702 if the court finds the opinion would "not be within the expert's specialized knowledge or would not be helpful to the jury." *State v. Flick*, 425 A.2d 167, 170 (Me. 1981); *see generally* Field & Murray, *Maine Evidence* §§ 702.1, 704.1.

---

[6] The expert even admitted that "most clinical neuropsychologists . . . wouldn't be necessarily talking about confabulation." That statement was another basis for the trial court's exclusion.

[¶29] Murray's expert formed the opinion that it was "more likely than not" that Diem was confabulating. But the expert had not personally examined Diem, nor conducted any testing on her, nor even read all of the witnesses' statements. As mentioned, the expert's conclusion that Diem was likely confabulating was based not on science but on mere discrepancies between her testimony and the evidence. As a result, the trial court correctly excluded the expert's opinion because it involved specialized knowledge that the expert did not possess, and therefore the opinion would not have been helpful to the jury.[7]

[¶30] We conclude that the trial court did not abuse its discretion in excluding the expert's statement.

The entry is:

Judgment and sentenced affirmed.

---

[7] Furthermore, even if the trial court had abused its discretion, the error would be harmless. *See* M.R.U. Crim. P. 52. The expert testified at length in front of the jury about confabulation generally, that Diem suffered a traumatic brain injury, and that inconsistencies between her testimony and the evidence could be related to the injury. The court only prevented the expert from testifying that it was likely that Diem was in fact confabulating. Certainly, the jury believed that the defense presented the expert witness to prove that Diem was confabulating. Given this testimony, it is highly improbable that the exclusion of the opinion on the ultimate issue affected the jury's verdict. *See State v. Willoughby*, 507 A.2d 1060, 1064 (Me. 1986).

Rory A. McNamara, Esq. (orally), Drake Law LLC, York, for appellant Christopher Murray

Aaron M. Frey, Attorney General, and Donald W. Macomber, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Penobscot County Unified Criminal Docket docket number CR-2017-4933
FOR CLERK REFERENCE ONLY